[No. B118547. Second Dist., Div. Two. Nov. 24, 1998.]

ARTHUR ANDERSEN LLP, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
CHARLES QUACKENBUSH, as Insurance Commissioner, etc., Real
Party in Interest.

1482

**COUNSEL**

Hennigan, Mercer & Bennett, J. Michael Hennigan, Jeanne E. Irving, John L. Amsden, Mary H. Chu and Thomas B. Watson for Petitioner.

No appearance for Respondent.

Mitchell, Silberberg & Knupp, Jean Pierre Nogues, Ronald A. Dinicola and Brenda S. Barton for Real Party in Interest.

**OPINION**

**ZEBROWSKI, J.**—This writ proceeding concerns an audit of the 1991 financial statements of Cal-American Insurance Company. The audit was performed by the major international accounting firm, Arthur Andersen LLP

(AA). AA issued an audit report containing the three typical paragraphs: introductory, scope and opinion. The introductory paragraph identified the financial reports that AA had reviewed: Cal-American's balance sheet plus "related statements of operations, stockholder's equity and cash flows." The scope paragraph identified the level of scrutiny to which these documents had been subjected—an audit conducted in accordance with generally accepted auditing standards (GAAS)—and also contained standard language noting that GAAS required AA to "plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement." The opinion paragraph stated AA's opinion, phrased in standard language, that Cal-American's financial statements "present fairly, in all material respects, the financial position of Cal-American . . . and the results of its operations and its cash flows . . . in conformity with generally accepted accounting principles [GAAP]." An opinion stated in this language is known as an "unqualified" or "clean" opinion, i.e., an opinion that the financial statements were prepared in accordance with GAAP.

As required by Insurance Code section 900.2 (Section 900.2), AA's audit report was filed with the Insurance Commissioner. The Insurance Commissioner has the statutory responsibility of monitoring insurance companies to ensure their ability to pay insurance claims. The Insurance Commissioner's staff reviewed AA's audit report and Cal-American's financial statements. The Insurance Commissioner's staff allegedly relied on AA's unqualified audit opinion to accept that Cal-American's financial statements fairly presented its financial position in accordance with GAAP. Since the financial statements showed Cal-American to be solvent, no regulatory action was taken. In actual fact, Cal-American was insolvent by a considerable margin. Its financial statements materially misrepresented its true financial condition by failing to disclose that a significant portion of Cal-American's assets were encumbered as a result of related party transactions.[1]

By the time the Insurance Commissioner discovered Cal-American's truly insolvent condition many months later, Cal-American had allegedly descended deeper into insolvency, and had become unable to pay an increased amount of insurance claims. The Insurance Commissioner promptly instituted conservation proceedings in Orange County, which were later converted into liquidation proceedings. In Los Angeles County, the Insurance

---

[1]"A related party transaction occurs when one party to a transaction has the ability to impose contract terms that would not have occurred if the parties had been unrelated." (Miller & Bailey, Comprehensive GAAS Guide (1991) p. 10.01 (GAAS Guide).) The GAAS Guide was cited several times in *Bily* v. *Arthur Young & Co.* (1992) 3 Cal.4th 370 [11 Cal.Rptr.2d 51, 834 P.2d 745, 48 A.L.R.5th 835] (*Bily*).) *Bily* controls the outcome in the instant case. Following *Bily*'s lead, we have also referred to the GAAS Guide where pertinent. The nature of the particular related party transactions involved in the instant case is developed further in the text.

Commissioner filed the instant lawsuit alleging professional negligence and negligent misrepresentation against AA. The Insurance Commissioner contends that he would have acted sooner and would have reduced the losses caused by Cal-American's deepening insolvency if AA's audit report had been accurate.

AA moved for summary judgment and summary adjudication, contending that AA owed no duty whatever to the interests represented by the Insurance Commissioner. The trial court denied AA's motion. AA then petitioned this court for a writ of mandate.

The primary issue is whether AA was entitled to summary judgment on the authority of *Bily, supra,* 3 Cal.4th 370. *Bily* generally concluded that the universe of persons to whom an auditor can be liable for a negligent audit is determined according to section 552 of the Restatement Second of Torts (Restatement 552). According to Restatement 552, as interpreted in *Bily,* an auditor may be liable for negligence to the audit client, and for negligent misrepresentation to "those persons who act in reliance upon those misrepresentations in a transaction which the auditor intended to influence." (*Bily, supra,* 3 Cal.4th at p. 376.) On the other hand, audit reports are often widely disseminated, and the auditor's potential liability does not extend to the entire universe of third persons who might possibly read an audit report. This limitation on the universe of potential plaintiffs was deemed necessary to avoid liability out of proportion to the auditor's degree of fault and unrelated to the degree of connection between an auditor's report and a third party's injuries. (*Id.* at pp. 401-402.) An issue is thus posed as to whether the Insurance Commissioner, with whom an audit report must be filed by statute, is within the universe of permissible plaintiffs defined in *Bily.*

AA also contends that the Insurance Commissioner, in seeking to marshall the assets of an insolvent insurer on behalf of the policy-buying public, acts merely as an ordinary receiver and therefore can enforce only those duties owing directly to the insurance company. AA contends that unless it caused damage to the value of Cal-American, it can have no liability for a negligent audit, even if the negligent audit damaged policyholders by damaging Cal-American's claims-paying ability. AA argues that since it was Cal-American's own officers who concealed the related party transactions, Cal-American did not rely on AA's audit for such information. AA additionally argues that since Cal-American was already insolvent at the time of the audit, the value of Cal-American to its owners could not be further damaged and therefore that the Insurance Commissioner has no right to recover. An issue is thus posed as to whether the statutory scheme which imposes upon the Insurance Commissioner the responsibility of ensuring the solvency of

insurers, and of marshalling the assets of an insolvent insurer in order to pay claims, imposes any duties upon AA other than those which would exist in the absence of these statutes.

In response to AA's petition, we stayed the trial date and issued an alternative writ to consider the effect of *Bily* and Section 900.2.

At the time the Legislature enacted Section 900.2 in 1990 (before *Bily*), controlling case law rejected the limiting rule of Restatement 552 and held an auditor liable to all foreseeable users of an audit report. Since the Legislature is deemed familiar with existing law at the time of an enactment, the state of the law at the time of enactment of Section 900.2 supports the conclusion that the Legislature expected and intended that Section 900.2's audit filing requirement would bring the Insurance Commissioner into the universe of foreseeable audit report users to whom an auditor could be liable for negligent misrepresentation in an audit report. *Bily*, in adopting the more limited approach of Restatement 552, did not change this result. Under *Bily* and Restatement 552, an auditor is liable for negligent misrepresentation in an audit report to persons who the auditor expects will rely on the report. Professionals in the business of auditing insurance companies, such as AA, are deemed familiar with the statutes governing insurance company audits. Hence the Insurance Commissioner is within the universe of persons to whom an auditor in AA's position may be liable for negligent misrepresentation in an audit report pursuant to Restatement 552 and *Bily*. Nor can AA's argument that the Insurance Commissioner acts only as an ordinary receiver exonerate AA from liability for negligent misrepresentations in an audit report. When carrying out his statutory regulatory duty of monitoring the claims-paying ability of an insurer, the Insurance Commissioner is not acting to protect the investment of the insurance company's owners, but instead to protect the policy-buying public. The Insurance Commissioner hence represents far broader interests than those typically represented by an ordinary receiver, whose potential claims are limited to those of the company in receivership.

We will therefore hold that the Insurance Commissioner, in his capacity as liquidator of Cal-American's estate, may recover from AA on behalf of the liquidation estate (for the benefit of policyholders and others having claims against the liquidation estate) for damage caused to the liquidation estate by negligent misrepresentations in AA's audit report. Although (as held in *Bily*) the Insurance Commissioner can recover from AA for professional negligence only if the Insurance Commissioner was AA's audit client, the issue of

who was the audit client was not fully developed in the trial court.[2] Hence both summary judgment and summary adjudication were properly denied. We will therefore deny AA's petition and discharge the alternative writ.[3]

## I. Factual and Procedural Background

The facts are many and detailed, but an abbreviated rendition captures sufficient essence to illustrate the legal issues posed.[4] Cal-American was in the business of selling auto insurance. Cal-American conducted its business in cooperation with two related entities: Bancsure Insurance Services, Inc.,

---

[2]For example, the record does not contain AA's audit engagement letter. In addition, AA's separate statement says nothing about how AA was retained for this audit. It implicitly appears to be the case that AA's engagement was solely with Cal-American, and that the Insurance Commissioner was at most an expected beneficiary by reason of Section 900.2. If this is correct, AA will be entitled to judgment on the Insurance Commissioner's negligence (as opposed to the negligent misrepresentation) claim. However, this was not the focus of AA's motion, and the record does not permit a conclusive determination on this point. The issue has some significance because if the Insurance Commissioner can sue only for negligent misrepresentation, the Insurance Commissioner must prove reliance on AA's audit report. In a suit for professional negligence, by contrast, reliance is only one of many possible methods for proving causation.

[3]In making this ruling, we are ruling simply that the trial judge was correct in denying summary judgment and summary adjudication. Some of the reasons for this conclusion are the gaps in moving party AA's showing, such as the lack of the engagement letter (which might possibly have limited the scope of the engagement undertaken). We do not decide what the proper ruling would be if these gaps were closed. Nor do we decide, as "law of the case," that AA was negligent. AA moved for summary judgment only on the grounds that the Insurance Commissioner was not within the universe of persons to whom AA owed a duty, and that the Insurance Commissioner is a mere receiver unable to assert claims beyond those assertable by Cal-American itself. The Insurance Commissioner did not cross-move for an adjudication of the scope of AA's duty. (Cf. Code Civ. Proc., § 437c, subd. (f)(1) [a party may move for summary adjudication as to one or more issues of duty].) Here we rule simply that the Insurance Commissioner *is* within the universe of persons to whom AA owed a duty of due care under the circumstances presented in this record, and that the Insurance Commissioner is not limited to asserting the claims assertable by Cal-American. In addition, Section 900.2 provides that an insurance audit must be prepared and filed in conformity with the requirements of the National Association of Insurance Commissioners (NAIC). The statute thus suggests that the precise scope of the duty of an auditor in auditing and reporting upon the financial statements of an insurance company might be ascertainable by reference to the NAIC materials. Documents which appear to be the NAIC materials are contained in the legislative history of Section 900.2, but the referenced NAIC materials have not been identified and provided as part of this record.

[4]A detailed recitation of the facts and evidence is not necessary for several reasons. First, the issue of whether or not AA had a duty to the Insurance Commissioner is largely an issue of law, rather than of fact. Second, as set forth in the "Discussion" section of the text, several of the arguments advanced by AA—and large amounts of evidence offered to support these arguments—may be disregarded because they are either inapposite or inherently incapable of supporting summary judgment in the present context. The factual recitation in the text has been limited to key facts which appear undisputed, except where expressly noted otherwise.

and Lenders Protection Insurance Services, Inc.[5] Bancsure and Lenders were either wholly owned or controlled by the chairman/chief executive officer (CEO) of Cal-American. The treasurer/chief financial officer of Cal-American (CFO) was also the CFO and treasurer of Bancsure and Lenders. The entire interrelated operation was in financial distress. Seeking to create the appearance of better financial health than actually existed, Cal-American consulted legal counsel. Counsel noted that Cal-American needed to increase "what the Department of Insurance calls 'surplus' for insurance accounting purposes so it can sell more insurance." Counsel then contrived a scheme to artificially inflate Cal-American's stated surplus. The scheme called for Cal-American to use liquid funds to buy a $1 million certificate of deposit (CD) from a bank. Cal-American then arranged for related entity Lenders to use the CD as collateral for a $1 million loan. Lenders then returned the $1 million to Cal-American. Cal-American now had $1 million back in hand, but was also reporting a $1 million CD in the bank. Through such machinations, Cal-American inflated its reported assets while shifting corresponding liabilities onto the financial statements of its related entities. Ultimately Cal-American reported two free-and-clear $1 million CD's in two different banks. Both of these CD's, however, were pledged to secure loans from the banks to the related entities. As AA's petition puts it, "Cal-American started with an unencumbered $2 million, and ended up with an unencumbered $2 million (plus an encumbered $2 million)." It was the encumbrances on the "second" $2 million that were not disclosed. In actual fact, Cal-American's $2 million had not miraculously grown to $4 million, but remained $2 million only.

Pledged assets such as the encumbered CD's are not eligible, pursuant to the statutory accounting principles (SAP) used to regulate the insurance industry, for inclusion among the "admitted assets" which make up an insurer's "statutory surplus." The amount of insurance business an insurer may write is a function of its statutory surplus. If the $2 million in pledged CD's had not been counted as assets on Cal-American's GAAP balance sheet, that balance sheet would have shown that Cal-American's liabilities exceeded its assets. In order to avoid the regulatory consequences of such an insolvency, Cal-American included the pledged CD's as assets on its 1991 GAAP balance sheet without disclosing the pledges.

AA conducted its audit of Cal-American's 1991 financial statements in 1992. To confirm Cal-American's report of two unencumbered $1 million CD's, AA did three things. First, AA obtained a "representation letter" from Cal-American which included a representation that "there are no liens or

---

[5]Bancsure provided marketing and customer services; Lenders provided underwriting, data processing, accounting and other services.

encumbrances" on any Cal-American asset "nor has any asset been pledged." Although this was false, the letter was nevertheless signed by the CEO and CFO of Cal-American. Second, AA obtained Cal-American's corporate minutes together with a written representation that they comprised a "full and complete record of all meetings" of the directors and stockholders during the relevant period. The minutes contained no mention of authorization of any encumbrance on Cal-American's assets. Third, AA sent a deposit confirmation form to the banks holding the CD's, requesting certain limited information. Most of the controversy centers on AA's use of this form.[6]

Prior to March 31, 1991, a longer, more detailed deposit confirmation form was in general use for confirming bank balances. As of March 31, 1991, however, a new, shorter, form was jointly approved by the American Bankers Association, the American Institute of Certified Public Accountants (AICPA) and the Bank Administration Institute. In a "Notice to Practitioners," the auditing standards division of the AICPA announced a revision of the form. The auditing standards notice explained that due to deregulation of financial institutions, a wider array of services and arrangements had become available from those institutions. It elaborated that although many financial institutions could easily provide information on deposit and loan balances, the systems which recorded deposit and loan information might not include information about other transactions and arrangements. Accordingly, the auditing standards notice continued, completion of those portions of the old form which requested information other than loan and deposit balances had become difficult. The form was hence revised to limit its function to obtaining information on only two subjects. Section 1 asked about "deposit balances." Section 2 asked about "loans" for which the audit client was "directly liable" to the financial institution. The auditing standards notice stated that "[t]he new form only provides for confirmation of deposit and loan balances. To confirm other transactions and arrangements, independent

---

[6]The Insurance Commissioner also complains of an entry on Cal-American's audited balance sheet reflecting an asset of $553,009 "Due from Affiliates." The Insurance Commissioner contends that AA should have known from financial statements and other documents contained in AA's work papers that the amount "Due from Affiliates" was uncollectible due to the insolvency or impending insolvency of these affiliates (Bancsure and Lenders). The Insurance Commissioner consequently contends that the inclusion of this amount as an asset without any reserve for uncollectible accounts overstated stockholder's equity, and materially misrepresented the true financial condition of the company. AA nevertheless opined that the balance sheet showing this amount as an asset without qualification was materially accurate. We need not delve deeply into the facts concerning the "Due from Affiliates" issue, inasmuch as the undiscovered pledges issue discussed in the text is enough to illustrate that AA's motion for summary judgment was properly denied.

Combining the undiscovered pledges issue with the "Due from Affiliates" issue, the Insurance Commissioner contends that Cal-American's balance sheet should have shown an approximate million dollar deficit instead of an approximate $1.5 million surplus, for a total overstatement on the order of $2.5 million.

auditors should send a separate letter, signed by the client, to a financial institution official responsible for the financial institution's relationship with the client or knowledgeable about the transactions or arrangements. Since some financial institutions centralize this function, the independent auditor should ascertain the appropriate recipient." The auditing standards notice concluded with illustrative letters designed to confirm information about various possible arrangements.[7]

AA did send the new, limited-scope, deposit confirmation form to the banks holding Cal-American's CD's. However, AA did not additionally send letters designed to determine whether or not these CDs had been pledged.[8] The banks responded with advice that the funds were on deposit as Cal-American's balance sheet reported, but did not reveal that the funds were pledged to secure loans to Cal-American's related entities. AA subsequently issued its unqualified audit opinion.

Together with AA's audit report, which contained the unqualified audit opinion, AA transmitted to Cal-American a "Memorandum of Suggestions for Improvements in Accounting Procedures and Internal Controls." The memorandum explained that pursuant to GAAS, auditors are encouraged to report certain matters concerning an entity's internal controls, and are required to report others. AA explained that, as part of its audit, AA had accordingly considered the internal control structure of Cal-American. AA emphasized that its review of Cal-American's internal control structure was limited to that necessary to determine the nature, extent and timing of the audit tests to be applied, but also stated that the accompanying memorandum on internal control structure was intended for use by both the management of Cal-American and the Department of Insurance. The record is thus clear that AA realized that Cal-American was regulated by the Department of Insurance, and that its "Memorandum of Suggestions," at least, would be transmitted to the department. The memorandum noted several issues, such as the

---

[7]The March 1991 issue of the Journal of Accountancy also contained, in its "For the Practicing Auditor" department, an article entitled *Bank Confirmation Form Receives Facelift*, authored by the director of audit research for the AICPA. (Whittington, *Bank Confirmation Form Receives Facelift* (Mar. 1991) J. of Acct. 82.) Although the article ends with a typical disclaimer that the article contains only the views of its author, the content of the article closely tracks the "Notice to Practitioners" issued by the auditing standards division of the AICPA on the same subject.

[8]The Insurance Commissioner's expert, Mr. R. Larry Johnson, contends in his declaration that AA's internal auditing manual erroneously references use of the old form, and hence does not provide proper guidance in the use of the new form together with supplemental letters regarding encumbrances. Unfortunately, although the record contains several lengthy chapters of AA's internal audit manual, neither Mr. Johnson's declaration nor the Insurance Commissioner's briefing provides any citation to where in AA's manual the noted references appear, and hence they are not quoted here.

credit risk attendant to maintaining large (above the federally insured limit) cash balances in "community banks,"[9] the "Due from Affiliates" entries in Cal-American's "statutory" filings and the risk that these accounts could be deemed "non-admitted" for statutory purposes, and other matters.

In 1990, two years before AA's audit of Cal-American, the Legislature enacted Section 900.2. Section 900.2 provides that "[a]ll insurers doing business in this state shall have an annual audit by an independent certified public accountant" and shall file an audit report with the Insurance Commissioner.[10] AA's audit report was filed with the Insurance Commissioner and was apparently accepted as compliance with Section 900.2.[11] In August 1992, a member of the Insurance Commissioner's staff reviewed AA's audit report and prepared a form entitled "CPA Audit Summary Report." In the audit summary form's space for reporting the audit report's "Opinion," the form provided three options which could be checked: "Clean," "Disclaimer," or "Qualified." "Clean" was checked. In the form's space for reporting the audit report's "Accounting Basis," the report offered the options "Statutory" or "GAAP." "GAAP" was checked. The only other entry (except for identifying material) was contained in the "Comments" section. The comments read in their entirety "No significant findings." This audit summary form was circulated to responsible personnel in the Department of Insurance, and no regulatory action was taken. The Insurance Commissioner presented evidence that the lack of regulatory action was in reliance on the unqualified opinion issued by AA. The Insurance Commissioner further presented evidence that had AA's audit report disclosed the pledges and Cal-American's

[9]The CD's in question were included in the cash balances referenced.

[10]Section 900.2 also states that "[t]he audit shall be conducted and the audit report prepared and filed in conformity with the Annual Audited Financial Reports instructions contained in the annual statement instructions as adopted from time to time by the National Association of Insurance Commissioners." Neither side has presented any evidence regarding whether the engagement undertaken by AA did or did not constitute an engagement to conduct an audit according to the NAIC instructions, nor whether the audit was in fact conducted according to those instructions, nor whether anything in those instructions varies materially from GAAS, nor anything else about the relationship between this statutory provision and the audit that was actually conducted. However, there is evidence that AA's audit report was timely filed with the Insurance Commissioner, was accepted by the Insurance Commissioner as compliance with Section 900.2, and was relied upon by the Insurance Commissioner's staff in the course of their regulatory duties. The audit report does contain a reconciliation between stockholder's equity and net income "as reported for statutory purposes" versus the amounts shown in the financial statements in accordance with GAAP, an apparent reference to the requirements of SAP. The audit report on its face contains no limiting language. Thus we have before us no claim that Cal-American and AA agreed to limit the scope of AA's audit or the use of AA's audit report, and hence do not decide what the effects of such an agreement might be in light of Section 900.2 and the lack of any limiting language in the audit report.

[11]There is no evidence that the Insurance Commissioner noted a failure to file an audit report as required by Section 900.2. Instead, the Insurance Commissioner's staff read and considered AA's audit report.

consequent insolvency, immediate regulatory steps to limit insured losses would have been taken. These steps would have included a halt to the writing of additional policies and to the pledging of additional funds, and could have extended to conservation or liquidation.

In 1992, Insurance Code section 730, subdivision (b), was amended to require that the Insurance Commissioner conduct an examination of every insurer admitted in this state at least once every five years.[12] The Insurance Commissioner conducted an examination of Cal-American in 1993. In the course of that examination, the Insurance Commissioner's staff undertook to confirm the existence of the CD's shown on Cal-American's balance sheet, just as AA had done as part of its audit. Similarly to AA, the Insurance Commissioner first inquired of Cal-American: "Are there any liens or encumbrances against the bank accounts or any restrictions on withdrawal?" Similar to the response AA had earlier received, Cal-American's CFO falsely responded "no." Also similarly to AA's effort, the Insurance Commissioner's staff sent to the depository banks the new shortened form for confirmation of account balances (discussed above). In addition, however, the Insurance Commissioner's staff also sent requests for additional information as had been advised in the AICPA auditing standards division notice regarding the new shortened form. In response to these requests for additional information, the banks revealed the pledges. The pledges demonstrated Cal-American's insolvency, and the Insurance Commissioner promptly commenced the conservation and liquidation proceedings mentioned above. At some point in this scenario, apparently near the time of the institution of the conservation proceedings, the banks set off the pledged CD's against the loans owing from Cal-American's related entities. This left Cal-American with insufficient funds to pay insurance claims. It was apparently following these setoffs that the conservation proceedings were converted to liquidation proceedings.[13]

The Insurance Commissioner then commenced this action against AA in his capacity as liquidator of Cal-American, on behalf of the policyholders

[12]It was also amended to require that the Insurance Commissioner "consider" the "reports of independent certified public accountants" in deciding the nature, scope, frequency and scheduling of the Insurance Commissioner's periodic examinations of insurers operating in California. Hence the statutory language indicating a duty owing by an auditor and enforceable by the Insurance Commissioner pursuant to *Bily* has been strengthened subsequent to AA's audit report.

[13]The Insurance Commissioner also sued at least one of the banks, but ultimately settled for only $100,000, allegedly due to the poor financial condition of that bank. The Insurance Commissioner contends that if AA's audit had revealed the pledges, the Insurance Commissioner could have taken earlier action against the bank at a time when the bank's financial condition had not yet so badly deteriorated, and could have recovered more for the liquidation estate from the bank.

and others interested in Cal-American's estate. In his first amended complaint (FAC), he alleges that "[p]ursuant to California law, CAL-AMERICAN was required to prepare and annually file with the department of insurance audited financial statements prepared in accordance with generally accepted accounting principles ("GAAP"). In addition, CAL-AMERICAN was required to prepare and file with the department of insurance an annual statement prepared in accordance with statutory accounting principles ("SAP") promulgated by the National Association of Insurance Commissioners and by the department of insurance."[14] The FAC alleges that AA audited Cal-American's financial statements for 1991 and issued its unqualified opinion of GAAP compliance; that the statements actually failed to conform to GAAP in that (among other things) they failed to reveal the pledges; that if the pledges had been disclosed, the Insurance Commissioner would have taken immediate regulatory action to protect Cal-American's estate; and that the financial condition of Cal-American's estate deteriorated further after the time of AA's audit report. The first cause of action alleges professional negligence, while the second cause of action alleges negligent misrepresentation. The primary distinction between the first and second causes of action is that the first alleges only a failure to comply with professional standards, while the second additionally alleges that the Insurance Commissioner relied on AA's misrepresentations.

AA then filed the motion for summary judgment or summary adjudication which led to this writ proceeding. AA's motion had several bases. In summary, it first contended that AA had no liability because *Cal-American* had not relied on AA's audit report, and that any reliance by the Insurance Commissioner was irrelevant because AA had no duty to the policyholders whose interests are statutorily represented by the Insurance Commissioner. Second, AA's motion contended that AA had no liability because the

---

[14]Insurance Code section 900 et seq. details the required content of financial statements filed by insurers with the department of insurance. Insurance Code former section 920 required that the financial statements filed "also contain a balance sheet of all the business of the company." Insurance Code section 923 provides for the use of forms adopted by the NAIC, and further provides that an insurer's annual statement "shall be completed in conformity with the Accounting Practices and Procedures Manual adopted by the National Association of Insurance Commissioners, to the extent that the practices and procedures contained in the manual do not conflict with any other provision of this code. The commissioner may make changes from time to time in the form of the statements and reports as seem to him or her best adapted to elicit from the insurers a true exhibit of their condition." These standards are commonly termed "Statutory Accounting Principles," or "SAP," and differ in certain respects from GAAP. Neither the NAIC manual nor any other requirements which may have been imposed by the Insurance Commissioner are in the record, but AA has presented no evidence that an insurer need not file GAAP balance sheets with the Insurance Commissioner in addition to SAP statements, as alleged in the complaint. The record reflects that Cal-American did file with the Insurance Commissioner GAAP financial statements audited by AA.

Insurance Commissioner allegedly knew at an earlier time that Cal-American's financial condition was precarious, yet committed "regulatory negligence" by not filing earlier for a conservatorship or liquidation. Third, it contended that AA had no liability because Cal-American had defrauded AA by concealing the pledges. In addition, AA contended that since Cal-American was already insolvent at the time of AA's audit, the failure of AA to discover the pledges at most allowed Cal-American to become more insolvent. AA postulated a theory that AA's only duty was to Cal-American as a going concern, and that AA had no duty to the estate of Cal-American, to the policyholders and others interested in that estate, or to the Insurance Commissioner as liquidator of that estate. AA thus contended that it could have no liability for allowing Cal-American to become "more" insolvent, because once Cal-American was insolvent (and thus had no stockholder's equity), it had no value as an investment, was essentially dead, and could not be further damaged by being rendered more dead. We review these contentions in the legal discussion below.

## II. Discussion

### A. The "Red Herring" Issues

Significant amounts of chaff must be cleared from the wheat in order to make sense of this case. The consequential issue is the effect of *Bily*, Restatement 552 and Section 900.2. We begin by reviewing and eliminating some of the many "red herring" issues raised in order to expedite a focus on the determinative issue.

#### 1. The "receiver's reliance" argument

AA contends that the Insurance Commissioner cannot present evidence of damage caused by reliance. AA's argument proceeds as follows: Cal-American's CEO and CFO obviously knew of the fraudulent reporting of the CD's, since they themselves concocted the fraudulent deposit kiting and reporting scheme. The CEO and CFO therefore did not rely on AA's audit to advise them whether or not the CD's were pledged. Leaping to a somewhat different subject, AA's argument continues by noting that an *ordinary receiver* is generally subject to the same defenses as the entity for whom the receiver acts. In the context of ordinary receiverships, there is a line of cases concerning the circumstances in which the knowledge of the officers or owners of an entity in receivership will or will not be "imputed" to a receiver who is suing a third party on behalf of the entity in receivership. AA argues that these cases apply, and require that the knowledge of Cal-American's CEO and CFO be imputed to the Insurance Commissioner, on the apparent

(although not expressly stated) theory that the Insurance Commissioner acts merely as an ordinary receiver. The argument concludes that this "imputation" bars the Insurance Commissioner's claims.

This argument suffers from a fatal disconnection. No authority is offered for the proposition that the Insurance Commissioner acts merely as an ordinary receiver. Ordinary receivers do not become involved until control of a business is taken away from its officers or owners due to insolvency, deadlock or other causes. Ordinary receivers do not monitor the solvency of an entity on behalf of persons, such as policyholders, who do business with the entity. The Insurance Code, by contrast, assigns such preconservatorship duties to the Insurance Commissioner. (See, e.g., Ins. Code, § 730, subd. (b).) In carrying out these duties, the Insurance Commissioner acts not in the interests of the equity owners of the insurance company, but rather in the interests of policyholders. Thus the Insurance Commissioner in this case is not seeking merely to prosecute claims of an entity under receivership. To the contrary, the essence of the Insurance Commissioner's claim is that AA damaged the policyholders. Thus even though a receivership may bear some points of analogy to a statutory insurance company liquidation (primarily in that each can involve the marshalling of the assets of an estate), an ordinary receivership is a different procedure for a different situation.

An example of the misleading effects of AA's inapt equating of the instant liquidation proceeding and an ordinary receivership is AA's reliance on the case of *F.D.I.C.* v. *Ernst & Young* (5th Cir. 1992) 967 F.2d 166. In that case, the FDIC, acting as assignee of the claim of a failed savings and loan association, sued the association's auditors for negligence and breach of contract. The Fifth Circuit stated: "Critically important to the ultimate resolution of the case is the FDIC's decision to bring this suit only as assignee of a claim by [the savings and loan association] against the auditors. The FDIC had authority to sue [the auditors] in its own behalf or on behalf of [the savings and loan association's] creditors, but it chose not to do so." (*Id.* at p. 169.) *F.D.I.C.* is hence quite different from the instant case. Here the Insurance Commissioner does not sue as the mere assignee of Cal-American for damage done to Cal-American, but rather in his statutory capacity for damage done to the policyholders and other creditors of Cal-American. (See, e.g., Ins. Code, § 1037; cf. *Matter of Liquidation of American Mut.* (1994) 417 Mass. 724 [632 N.E.2d 1209, 1213] [under Massachusetts law, insurance commissioner has authority to bring claims against auditors on behalf of policyholders and creditors]; *Foster* v. *Peat Marwick Main & Co.* (1991) 138 Pa. Commw. 147 [587 A.2d 382, 384-386] [under Pennsylvania law, insurance commissioner may sue auditors on behalf of policyholders and creditors]; *Matter of Integrity Ins. Co.* (1990) 240 N.J.Super. 480 [573 A.2d 928, 933] [under New Jersey law, insurance commissioner can prosecute claims against auditors on behalf of policyholders and

creditors to the extent that such claims inure to the benefit of the insurer's estate in general as opposed to a particular claimant]; *Corcoran* v. *Frank B. Hall & Co., Inc.* (1989) 149 A.D.2d 165 [545 N.Y.S.2d 278, 280-284] [under New York law, insurance commissioner can advance claims against auditors on behalf of policyholders and creditors of insolvent insurer].) AA's line of cases regarding ordinary receiverships, imputation of knowledge from a corporate officer to an ordinary receiver, etc., therefore does not apply to the instant case.

### 2. *The "setoff" argument*

■ In a similar vein, AA cites case law providing that the Insurance Commissioner, when pursuing claims as liquidator of an insolvent insurer, is subject to rights of setoff (generally contractual) possessed by debtors of the insolvent estate. (See, e.g., *Prudential Reinsurance Co.* v. *Superior Court* (1992) 3 Cal.4th 1118 [14 Cal.Rptr.2d 749, 842 P.2d 48]; *Downey* v. *Humphreys* (1951) 102 Cal.App.2d 323 [227 P.2d 484].) AA expands the point far beyond the holdings of these cases, however, citing them in support of an argument that the Insurance Commissioner as liquidator has no rights against AA other than those that could have been asserted by Cal-American. AA then argues that Cal-American cannot assert negligent misrepresentation against AA because Cal-American's CEO and CFO knew about the hidden pledges and hence did not rely on AA's audit.

The cited cases concerning setoff do not deal with *Bily*, Restatement 552, Section 900.2, the Insurance Commissioner's statutory duties, or the Insurance Commissioner's right to recover on behalf of the policyholders for damages caused by negligent misrepresentations in an audit report on which the Insurance Commissioner relied. The setoff cases deal only with whether a debt owing to an insolvent estate may be offset by a credit owing from the insolvent estate. The setoff cases are inapposite, at least insofar as the issues of summary judgment or summary adjudication are concerned.[15]

### 3. *The "Insurance Commissioner's capacity" argument*

AA raises two additional contentions regarding the capacity in which the Insurance Commissioner sues. First, AA emphasizes that the Insurance Commissioner has conceded that he is not pursuing the claims of individual policyholders or others interested in Cal-American's estate. AA magnifies this concession into an argument that the Insurance Commissioner therefore may not recover damages for the benefit of the policyholders. This does not

---

[15]The record reflects that AA has sued Cal-American's CEO and CFO for indemnity. Issues such as indemnity, comparative fault, etc., are beyond the scope of this writ proceeding.

follow. (Cf., e.g., *Matter of Liquidation of American Mut., supra,* 632 N.E.2d 1209; *Foster* v. *Peat Marwick Main & Co., supra,* 587 A.2d 382; *Matter of Integrity Ins. Co., supra,* 573 A.2d 928; *Corcoran* v. *Frank B. Hall & Co., Inc., supra,* 545 N.Y.S.2d 278.) There is a significant distinction between pursuing a claim of negligent misrepresentation on behalf of the liquidation estate versus pursuing the idiosyncratic claims of numerous policyholders. (See, e.g., *Matter of Integrity Ins. Co., supra,* 573 A.2d 928.) Some policyholders have insurance claims against Cal-American's estate. The Insurance Commissioner is simply assembling funds to pay those claims. Many policyholder claims have been converted into claims by the California Insurance Guarantee Association (CIGA), which paid claims that Cal-American's depleted estate was unable to pay. CIGA therefore now also has claims against Cal-American's liquidation estate. Although the Insurance Commissioner is suing for the benefit of policyholders and CIGA in the sense that he sues to recover for the liquidation estate, since funds in the liquidation estate will be used to pay policyholder and CIGA claims, it is clear that the Insurance Commissioner is not asserting, for example, the claim of any particular individual for a negligent misrepresentation made directly to that individual.

Second, AA emphasizes as "critically" important that the Insurance Commissioner sues "solely as liquidator of Cal-American," and "does not bring this action in his capacity as regulator." Neither the briefing nor the record articulates any distinction of present significance between the capacities of "regulator" and "liquidator." Instead, this distinction appears to be, at least for the present purpose of evaluating AA's purported entitlement to summary judgment, semantic only. The liquidator versus regulator issue initially arose as a consequence of AA's contention that the Insurance Commissioner was negligent in regulating Cal-American, and that the Insurance Commissioner's alleged regulatory negligence completely exonerates AA from the consequences of its allegedly negligent audit. In response to AA's efforts to conduct discovery on the Insurance Commissioner's alleged regulatory negligence, the Insurance Commissioner attempted to segregate his capacity as liquidator from his capacity as regulator, arguing that his regulatory negligence (if any) could not be used to mitigate AA's liability to the liquidation estate, and hence that the discovery in question should be denied. Whatever the merits of this discovery argument, the semantic argument about whether the Insurance Commissioner is suing as a "regulator" or as a "liquidator" has no identified bearing on the principal issue presented on summary judgment: is the Insurance Commissioner, in his capacity as representative of the policyholders (whether termed "regulator" or "liquidator"), within the universe of potential plaintiffs to whom AA owes a duty of due care in making representations in an audit report?

### 4. *The "regulatory negligence" argument*

AA devoted a large portion of its argument and evidentiary showing to attempting to establish that the Insurance Commissioner was negligent in allowing Cal-American to continue in business until the pledges were discovered. Thus AA's separate statement offers references to such matters as Cal-American's status on NAIC's "benchmark ratios" at various times, the state of Cal-American's premium-to-surplus ratio at various times, the amount of capital and surplus Cal-American was required to have at various times, the actions taken by the Insurance Commissioner's staff at various times, etc. This showing could not support summary judgment for two interrelated reasons. First, AA did not establish as a legal matter that poor regulatory performance by the Insurance Commissioner, assuming it occurred, would provide a *complete* defense to AA. Second, AA did not establish as a factual matter the *complete lack* of any causal connection between the alleged negligent misrepresentations in its audit report and the damage to Cal-American's estate.

### 5. *The "factual impossibility" argument*

AA also argues that summary judgment should have been granted because it is "factually impossible" that the Insurance Commissioner could have relied upon AA's audit report. AA bases this claim of impossibility on the fact that, subsequent to the events in question here, the Insurance Commissioner designated a group of Department of Insurance employees as an "Early Warning Team" having the duty of initiating quick action when an insurer is suspected of insolvency. AA argues that since these employees did not receive the designation "Early Warning Team" until after the operative events, it is factually impossible that they could have done anything to mitigate Cal-American's losses at an earlier time. The record, however, contains evidence that the Insurance Commissioner did, at the relevant times, utilize a group of key personnel for "early warning" purposes, and that this group was later given the title "Early Warning Team." The fact that the title may have been bestowed only later is quite a different circumstance from factual impossibility. AA's contentions of "factual impossibility" therefore have no merit.

### 6. *The "second bullet" argument*

As noted above, Cal-American was actually insolvent before AA's audit, and AA argues that it owed no duty of care to Cal-American's policyholders but instead had a duty only to the equity owners of Cal-American. AA builds on these points to argue that once Cal-American was insolvent, it was dead,

it had no further value to its owners, it could not be further damaged, and a "second bullet" could do it no harm. Since we will conclude below that AA did have a duty of care under *Bily*, Restatement 552 and Section 900.2 to the policyholders as represented by the Insurance Commissioner, we will reject AA's contention that it can have no liability for causing a "deepened insolvency." The extensive argument and evidence on this issue therefore need not be considered further.

7. *The "Cal-American reliance" argument*

Finally, throughout its papers, consuming most of the space, AA argues that Cal-American did not rely on AA's failure to disclose the pledges in AA's audit report. This is a red herring inasmuch as the real issue is whether AA can be liable for making negligent misrepresentations *upon which the Insurance Commissioner relied* to the damage of the estate's ability to pay insurance claims. We turn now to that issue.

B. *Bily, Section 900.2 and Restatement 552*

1. *Section 900.2*

■ Section 900.2 was enacted in 1990 as part of Assembly No. Bill 3833. It requires that "[a]ll insurers doing business in this state shall have an annual audit by an independent certified public accountant" and shall file an audit report with the Insurance Commissioner. The legislative history copiously and consistently shows that the impetus for this new statute was the insolvency of Coastal Insurance Company, and a legislative intent that future such insolvencies be avoided through improved monitoring by the department of insurance and the NAIC. (See, e.g., analysis of Assembly Bill No. 3833 prepared for the Assembly Committee on Finance and Insurance ["This bill will strengthen solvency regulation over insurers who, in the past, have played fast and loose with their financial statements. As was brought out in the Coastal Insurance Company hearings, there was widespread evidence of the submission of annual statements containing misleading and false figures. [¶] This bill reflects the recommendations set forth in this Committee's February 1990 Report entitled: 'The Insolvency and Liquidation of the COASTAL INSURANCE COMPANY: Its Causes and Effects.'"]; background information request from legislative bill file of the Assembly Committee on Finance and Insurance on Assembly Bill No. 3833 ["In consideration of the Coastal Insurance [Company] bankruptcy case, the intent of this bill is to give state regulators early warning of fraudulent practices and management error."]; analysis of Assembly Bill No. 3833 prepared for the Senate Committee on Insurance, Claims and Corporations ["[A]ll insurance companies

domiciled in California must file . . . each year a comprehensive financial statement as to the company's financial condition . . . . [¶] The annual statement submissions are used by the National Association of Insurance Commissioners, and by the Department of Insurance to determine whether or not an insurance company needs to be watched for special regulatory action. If these reports can provide false data, the 'early warning' mechanisms established by the National Association and the Department are of little use. . . . [¶] This legislation resulted from hearings conducted by the Assembly Finance and Insurance Committee with respect to the insolvency of the Coastal Insurance Company. . . . [¶] Coastal Insurance Company was an automobile insurance company that expanded rapidly and upon insolvency left an $80 million loss that is presently being paid by California automobile policyholders through CIGA surcharges on their automobile policies. [¶] The Committee report concluded that the annual statements filed by Coastal Insurance Company contained false and misleading information, and had the report been audited, as suggested by this legislation, the plight of the company could have been detected earlier by the Department of Insurance."]; background information request from legislative bill file of Senate Committee on Insurance, Claims and Corporations on Assembly Bill No. 3833 ["As a result of the Coastal [I]nsurance [C]ompany insolvency, the intent of this bill is to provide the insurance commissioners with the earliest possible warning of impending financial collapse."].) After the bill as amended was unanimously passed by the Assembly and the Senate, the Department of Insurance recommended that the Governor sign the bill, explaining: "One of the problems the Department of Insurance has with the current financial reports is that, absent on-site financial examination, we have no way of ensuring that the insurer's financial health is accurately reflected in the annual report. And it is simply impractical for the department to conduct annual examinations on all insurers. Therefore, in order to better carry out our regulatory function, audited reports provide much greater assurance that the data accurately reflects the true financial picture of the insurer." The Governor signed, and Section 900.2 became law.

At the time of these legislative events, case law held that an auditor owed a duty of care to all reasonably foreseeable users of an audit report. (*International Mortgage Co.* v. *John P. Butler Accountancy Corp.* (1986) 177 Cal.App.3d 806, 820 [223 Cal.Rptr. 218] (*International Mortgage*).) The Legislature is presumed to know existing law when it enacts a new statute, including the existing state of the common law. (See, e.g., *Keeler* v. *Superior Court* (1970) 2 Cal.3d 619, 625 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420] ["It will be presumed, of course, that in enacting a statute the Legislature was familiar with the relevant rules of the common law."]; *People* v. *Welch* (1971) 20 Cal.App.3d 997, 1002 [98 Cal.Rptr. 113] ["It also

may be assumed that the 1951 amendments were enacted by a Legislature familiar with its previous acts, existing judicial decisions construing the same, and the common law rules."]; *Schmidt* v. *Southern Cal. Rapid Transit Dist.* (1993) 14 Cal.App.4th 23, 27 [17 Cal.Rptr.2d 340] ["[I]t is assumed that the Legislature has existing laws in mind at the time that it enacts a new statute. (*Estate of McDill* (1975) 14 Cal.3d 831, 837 [122 Cal.Rptr. 754, 537 P.2d 874].)"].) ▪▪▪ Consistent with the presumption that the Legislature knows the law and the effect of the law, it may be concluded that the Legislature intended, when it enacted Section 900.2, to bring the Insurance Commissioner into the universe of potential plaintiffs to whom an auditor would owe a duty of care when auditing an insurance company, since that universe encompassed all foreseeable users of the audit report.[16]

### 2. *Bily and Restatement 552*

In 1992, *Bily* was decided. Although *Bily* constricted the universe of potential plaintiffs to whom an auditor may be liable, it did nothing to controvert the conclusion that the Insurance Commissioner remains inside that universe. Instead, *Bily* reinforced that conclusion. *Bily* examined both the strict "privity" rule announced by Justice Cardozo in *Ultramares Corp.* v. *Touche* (1931) 255 N.Y. 170 [174 N.E. 441, 74 A.L.R. 1139] (essentially restricting liability to parties in contractual privity with the auditor) and the expansive "foreseeability" rule announced by Justice Trotter in *International Mortgage, supra,* 177 Cal.App.3d 806 (extending liability to all foreseeable users). Rejecting both of these polar approaches, and expressly disapproving *International Mortgage,* the Supreme Court in *Bily* adopted the compromise approach of Restatement 552. (*Bily, supra,* 3 Cal.4th at pp. 404-408, 416; cf. *Kohala Agr.* v. *Deloitte & Touche* (1997) 86 Hawaii 301 [949 P.2d 141, 158-159] [majority of courts have approved Restatement 552 as steering middle ground between privity and foreseeability in cases alleging negligent misrepresentation by an accountant]; see also Annot., Liability of Independent Accountant to Investors or Shareholders (1997) 48 A.L.R.5th 389.)

Restatement 552, subdivision (2) defines the universe of potential plaintiffs to whom a negligent supplier of information can be held liable as (a)

---

[16]The all "reasonably foreseeable plaintiffs" rule announced in *International Mortgage, supra,* 177 Cal.App.3d 806 was well known when Section 900.2 was enacted in 1990. For example, the ninth edition of Witkin's treatise on California law at that time devoted two and one-half pages to *International Mortgage.* (6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 805(b), pp. 157-160.) The conclusion that the Legislature intended to subject auditors to a duty of care owing to the Insurance Commissioner was further reinforced in 1992 when the Legislature amended Insurance Code section 730, subdivision (b) to require the Insurance Commissioner to consider the reports of independent certified public accountants in determining the nature, scope, frequency and scheduling of the Insurance Commissioner's periodic examinations.

"persons for whose benefit and guidance" the supplier of information (here, the auditor) *intends* to supply the information, or those persons to whom the auditor *knows* that the recipient of the information (here, the audit client) intends to supply it, and (b) persons who rely in a transaction the auditor *intends* his audit to influence or *knows* that the audit client intends the audit to influence. Applying this formulation, *Bily* decided that an auditor's liability on a professional negligence theory is limited to the audit client, and that an auditor's liability on a negligent misrepresentation theory is limited to parties who the auditor intends to influence or who the auditor knows will rely on the audit report. (*Bily, supra,* 3 Cal.4th at pp. 414-416; see also, *Industrial Indemnity Co.* v. *Touche Ross & Co.* (1993) 13 Cal.App.4th 1086, 1093 [17 Cal.Rptr.2d 29] [*Bily* applies retroactively].) In rejecting an argument in the dissent that the broader foreseeability rule should apply, the majority in *Bily* amplified its holding by explaining that "[u]nder the rule we adopt, if the auditor knows of a third party transaction or type of transaction which the audit report has been commissioned to influence, the report is also necessarily directed to that specific third party." (*Bily, supra,* 3 Cal.4th at p. 414, fn. 22.) Hence under *Bily,* if an insurance company "commissions" an audit report to satisfy its filing requirement under Section 900.2, the auditor could be liable to the Insurance Commissioner if the audit report contained negligent misrepresentations.[17] (Cf. *Bowers* v. *Allied Inv. Corp.* (D. Maine 1993) 822 F.Supp. 835, 840 ["The Restatement [section 552] allows a restricted group of third parties to recover for pecuniary losses attributable to inaccurate financial statements. The restricted group includes third parties whom the accountant intends to influence and those . . . whom the accountant knows their clients intend to influence."].)

The comment to Restatement 552, subdivision (2) confirms this conclusion. The comment notes that under Restatement 552, "the negligent supplier of misinformation" is liable "only to those persons for whose benefit and guidance it [the information] is supplied." However, "it is not necessary that the [negligent supplier of misinformation] should have any particular person in mind as the intended, or even the probable, recipient of the information. In other words, it is not required that the person who is to become the plaintiff be identified or known to the defendant as an individual when the information is supplied. It is enough that the [negligent supplier of misinformation] intends it to reach and influence either a particular person or persons, known to him, or a group or class of persons, distinct from the much larger class who might reasonably be expected sooner or later to have access to the information and foreseeably to take some action in reliance upon it. It is

---

[17]AA argues against this conclusion in the particular circumstances of this case by contending that it was unaware of the filing requirement of Section 900.2. We discuss AA's claim of ignorance *post.*

enough, likewise, that the [negligent supplier of misinformation] knows that his recipient intends to transmit the information to a similar person, persons or group." (Rest. 552, com. (h), pp. 132-133.)

### 3. *The Bonhiver case*

 In adopting the approach of Restatement 552 to identify the universe of permissible plaintiffs, *Bily* noted that "[a]t least 17 state and federal decisions have endorsed the rule [of Restatement 552] in this and related contexts." (*Bily, supra,* 3 Cal.4th at p. 394; see also, e.g., *First Nat. Bank of Commerce* v. *Monco Agency Inc.* (5th Cir. 1990) 911 F.2d 1053, 1060 [approximately 19 jurisdictions apply Restatement 552 to issue of negligent misrepresentation of commercial information].) One of the 17 decisions adopting Restatement 552 cited by *Bily* was *Bonhiver* v. *Graff* (1976) 311 Minn. 111 [248 N.W.2d 291, 92 A.L.R.3d 371] (*Bonhiver*). (*Bily, supra,* 3 Cal.4th at p. 394, fn. 9.) *Bonhiver* was decided in 1976, while the Restatement Second of Torts, was not published until 1977. *Bonhiver* consequently was decided according to the tentative draft of Restatement 552. The wording differences between the tentative and final versions of Restatement 552, however, are immaterial for present purposes (cf. *Guenther* v. *Cooper Life Sciences, Inc.* (N.D.Cal. 1990) 759 F.Supp. 1437, 1443, fn. 6 [discussing minor differences]), and *Bily* therefore treated *Bonhiver* as an example of Restatement 552 applied.

The facts of *Bonhiver* and the facts of the instant case differ primarily in one detail. In the instant case, AA conducted only an audit—Cal-American was responsible in the first instance for the preparation of the financial statements. In *Bonhiver*, by contrast, the accountant did not conduct an audit, but instead participated in the preparation of the inaccurate accounting records. (*Bonhiver, supra,* 311 Minn. at p. 116 [248 N.W.2d at pp. 295-296].) This is the only basis on which *Bonhiver* could be distinguished from the instant case, but this distinction is immaterial insofar as the proper application of Restatement 552 and *Bily* are concerned.[18]

In *Bonhiver*, the books of an insurance company were in need of updating. An accounting firm was hired to perform various accounting tasks. The

---

[18]The accountants in *Bonhiver* had not performed an audit and had not made an audit report, but instead had performed other accounting services. Nevertheless, because they knew the insurance commissioner was relying on their work, they were found liable for their negligent misrepresentations pursuant to the tentative draft of Restatement 552. The distinction between an audit and other accounting work is not important for present purposes; the critical point is the insurance commissioner's reliance on negligent misrepresentations.

*Bonhiver* also deals with the measure of damages, an issue not involved in this writ petition. It is instructive to note, however, that *Bonhiver* permitted a recovery only of the amount "needed to retire all unpaid claims." (*Bonhiver, supra,* 311 Minn. at p. 131 [248 N.W.2d at p. 303].) The court ruled that this was the highest amount that could be recovered because any

assigned accountant made various entries in the books and prepared work-papers. Working in the same room as a team of examiners from the office of the Minnesota Insurance Commissioner, the accountant supplied the examiners with his workpapers and other information. Some of the information was incorrect because the accountant failed to investigate related party transactions. The examiners, relying on the accountant's work, concluded that the insurer was solvent. However, it was actually insolvent because of the related party transactions. The Minnesota Insurance Commissioner allowed the company to continue business for approximately an additional year. During that year, the company's owners withdrew large sums of cash and the insolvency worsened. "Had the examination disclosed that the company was insolvent, its continued operation would have been challenged by the commissioner." (*Bonhiver, supra,* 311 Minn. at p. 115 [248 N.W.2d at p. 295].) After the insolvency became apparent, the insurance commissioner was appointed receiver for the insolvent insurer.[19] He filed suit against the accountants. His suit was "based upon damage sustained by [the insurance company] as a result of misappropriation by [the insurance company's owners] which was allowed to continue because of defendants' negligence." (*Id.* at p. 117 [248 N.W.2d at p. 296].)

The accountants contended, among other things, that the insurance commissioner "cannot maintain this action, as defendants are charged simply with failing to discover the fraud committed by the company's own officers." (*Bonhiver, supra,* 311 Minn. at p. 118 [248 N.W.2d at p. 296].) The Minnesota Supreme Court ruled, however, that "[w]hether or not the company would be precluded from bringing this suit (the company was the victim of the fraud, and not the perpetrator), '[t]he receiver represents the rights of creditors and is not bound by the fraudulent acts of a former officer of the corporation.' [Citations.]" (*Ibid.*) "In the case at bar," the court explained, "the defendants knew that the commissioner was conducting his examination in order to determine whether [the insurance company] was financially stable enough to be allowed to continue to do business in Minnesota. They knew that he was relying upon their work in making that determination. Thus, under the Restatement rule, defendants are liable to him for any loss he has suffered as a result of his reliance. [¶] However, it would make little sense to speak of loss suffered by the commissioner. He has not been injured—he has no interest in the matter himself. Rather, he is a representative. The duties of the commissioner (set forth in Minn.St. c. 60A) to examine and monitor insurance companies which operate in this

additional amount would go to the stockholders, who were the persons who had withdrawn funds from the company.

[19]The terms "conservator" and "liquidator" are used in California, instead of "receiver." (See, e.g., Ins. Code, §§ 1011 and 1016.)

state are meant to provide protection to certain people who deal with these companies. Policyholders, for example, are not going to examine the books of the companies themselves; their 'agent' in this matter is the commissioner. Thus, if they are injured because of reliance by the commissioner upon misrepresentations made by the defendants, and defendants are aware of that reliance, defendants' liability arguably should extend to the injured policyholders under § 552." (*Id.* at p. 129 [248 N.W.2d at p. 302].) A judgment of damages in favor of the insurance commissioner was then affirmed. (*Id.* at p. 123 [248 N.W.2d at p. 299]; see also *Matter of Liquidation of American Mut., supra,* 632 N.E.2d at p. 1213; *Foster* v. *Peat Marwick Main & Co., supra,* 587 A.2d at pp. 384-386; *Matter of Integrity Ins. Co., supra,* 573 A.2d at p. 933; *Corcoran* v. *Frank B. Hall & Co., Inc., supra,* 545 N.Y.S.2d at pp. 280-284.)[20]

*Bonhiver* is closely on point with the instant case. In *Bonhiver,* as here, the insurance commissioner was acting for the benefit of policyholders. In *Bonhiver,* as here, the insurance commissioner relied on misrepresentations made by the accountant to conclude that the insurance company was solvent and to allow the insurance company to continue in business. In *Bonhiver,* as here, the insurance company was actually insolvent at the time of the insurance commissioner's reliance. In *Bonhiver,* as here, the insolvency worsened after the insurance commissioner's reliance. On the authority of *Bonhiver,* the Insurance Commissioner here is entitled to an opportunity to prove his case, and was not subject to summary judgment or adjudication on the theory that the accountant owed him no duty.

### 4. *AA's claims of lack of notice*

*Bonhiver* is the case most factually on point. Although neither side cited it, AA does attempt to avoid the consequences of reasoning of the type contained in *Bonhiver* by disclaiming any knowledge of Section 900.2. AA

---

[20]Instead of citing *Bonhiver* or other cases involving an insurance commissioner suing on behalf of policyholders, AA cites *Eldred* v. *McGladrey, Hendrickson & Pullen* (Iowa 1991) 468 N.W.2d 218. *Eldred,* however, is merely an example of the application of Restatement 552. In *Eldred,* 18 out of 18,000 investors in a failed insurance company sued the insurance company's auditors. Their claim was that the auditor had prepared an audit report, which was filed with the insurance commissioner. The investors contended that the insurance commissioner relied on the audit report, that as a consequence the company became further insolvent, and that as a consequence the investors were damaged. There was no claim that the investors had individually relied on the audit report, that the auditor knew of these particular investors or intended to influence them, etc. (468 N.W.2d at p. 219.) The Supreme Court of Iowa, without extended discussion, held that the claims of the investors were too attenuated to permit them to recover against the auditor. (*Id.* at p. 221.) In the instant case, by contrast, it is the Insurance Commissioner who is suing, and on behalf of policyholders he is charged by statute with protecting. *Eldred* is not on point.

points out that Restatement 552 includes within the universe of permissible plaintiffs only those parties who AA "intends" or "knows" will rely on AA's audit report. (Rest. 552, subd. (2)(a), (b).) Since, according to AA, AA was not aware of Section 900.2's filing requirement, AA argues that it cannot be liable to the Insurance Commissioner under Restatement 552 because it did not "intend" or "know" the audit report would be supplied to the Insurance Commissioner.

This argument fails because it erroneously equates lack of factual knowledge with lack of legal knowledge. AA is correct that under Restatement 552, lack of factual knowledge that an audit report will be supplied to a particular third party will generally preclude auditor liability to that third party (investor, lender, credit vendor, etc.). A lack of legal knowledge, however, is quite a different matter. ■ It was established long ago that ignorance of the law does not excuse one from the consequences of the law. (See, e.g., *Brumagim* v. *Tillinghast* (1861) 18 Cal. 265, 271 [citing old English law; " '[e]very man' . . . 'must be taken to be cognizant of the law; otherwise, there is no saying to what extent the excuse of ignorance might be carried. It would be urged in almost every case.' "]; *Ruhl* v. *Mott* (1898) 120 Cal. 668, 678 [53 P. 304] [ignorance of the law cannot excuse]; *Hale* v. *Morgan* (1978) 22 Cal.3d 388, 396 [149 Cal.Rptr. 375, 584 P.2d 512] [ignorance of the law is no excuse]; *Ainsworth* v. *State Bar* (1988) 46 Cal.3d 1218, 1234 [252 Cal.Rptr. 267, 762 P.2d 431, 86 A.L.R.4th 1053] [ignorance of Rules of Professional Conduct does not excuse violations].) The rule that ignorance of the law is no excuse applies even in criminal proceedings, where personal liberty is at stake. (See, e.g., *People* v. *Honig* (1996) 48 Cal.App.4th 289, 337 [55 Cal.Rptr.2d 555] [lack of knowledge of conflict of interest prohibitions no defense]; *People* v. *Mills* (1992) 6 Cal.App.4th 1278, 1290-1291 [8 Cal.Rptr.2d 310] [felon knew law prohibited him from possessing concealable firearm, did not know statute had been amended to prohibit his possession of a shotgun, conviction of possessing shotgun nonetheless affirmed].) Other cases have stated the same concept in different language. (See, e.g., *Anderson* v. *Superior Court* (1995) 11 Cal.4th 1152, 1161 [48 Cal.Rptr.2d 766, 907 P.2d 1312] [all of us are presumed to know the law]; *Bank One Texas* v. *Pollack* (1994) 24 Cal.App.4th 973, 981 [29 Cal.Rptr.2d 510] [one is presumed to know the law]; *1119 Delaware* v. *Continental Land Title Co.* (1993) 16 Cal.App.4th 992, 1002 [20 Cal.Rptr.2d 438] [persons are presumed to know the law]; *Boehm* v. *Spreckels* (1920) 183 Cal. 239, 248 [191 P. 5] [everyone is presumed to know the law]; *Murphy* v. *Clayton* (1896) 113 Cal. 153, 155 [45 P. 267] [everyone is presumed to know the law]; *People* v. *Munroe* (1893) 100 Cal. 664, 670 [35 P. 326] [every "man" is presumed to know the law]; *In re Reinhardt* (1887) 74 Cal. 365, 368 [16 P. 13] [every "man" is presumed to know the law];

*Borden* v. *Division of Medical Quality* (1994) 30 Cal.App.4th 874, 884 [35 Cal.Rptr.2d 905] [plaintiff presumed to have been on notice of change in law]; *People* v. *Sweet* (1989) 207 Cal.App.3d 78, 87 [254 Cal.Rptr. 567] [criminal defendant had constructive notice of existing criminal laws].) It is thus clear that the legal effect of a statute cannot be avoided merely by pleading ignorance of the statute. If it could, the Legislature's efforts to shape public policy and the judiciary's efforts to interpret the statutory law and to shape the common law could easily be frustrated either by deliberate maintenance of ignorance or by false claims of it. ██ The rule that ignorance is no excuse is especially apt in the case of AA, a major firm of independent certified public accountants in the business of auditing insurance companies. A firm such as AA is charged with knowledge of the law pertaining to insurance company audits whether AA actually was aware of the law or not. (Cf. *First Nat. Bank of Commerce* v. *Monco Agency Inc.*, *supra*, 911 F.2d at p. 1062 [accountant must have actual, as opposed to constructive, knowledge that audit will be supplied to third party non-client before liability attaches under Restatement 552 and Louisiana law; no statutory filing requirement involved]; *Badische Corp.* v. *Caylor* (11th Cir. 1987) 825 F.2d 339 [under Georgia law, accountant liable only to those persons who accountant is actually aware will rely upon information; no statutory filing requirement involved]; *TFC Banking and Sav., F.A.* v. *Arthur Young & Co.* (D.Minn. 1988) 706 F.Supp. 1408, 1418-1419 [actual knowledge of party who will rely not required under *Bonhiver*; sufficient that accountant knew work would be used to influence a transaction of which it had knowledge]; *Matter of DeLorean Motor Co.* (Bankr.E.D.Mich. 1986) 56 B.R. 936, 944 [suggesting that Michigan statute entitling directors to rely on audit might subject auditor to liability].)

### 5. *Conclusion*

In view of the filing requirement of Section 900.2, *Bily*'s adoption of Restatement 552, *Bonhiver* and the related case and statutory law discussed above, we hold that an auditor, when auditing an insurance company, owes a duty of due care not to make negligent misrepresentations to the Insurance Commissioner in his capacity as the representative of policyholders and creditors. We find that when the Insurance Commissioner receives an audit report filed pursuant to Section 900.2, the Insurance Commissioner comes within the universe of potential plaintiffs defined by *Bily* and Restatement 552. If the Insurance Commissioner relies on negligent misrepresentations in such an audit report, and if the claims-paying ability of the insurance company is damaged as a consequence, an award of damages may be made to the Insurance Commissioner and against the auditor on behalf of the policyholders and other creditors as was done in *Bonhiver*, *supra*, 248 N.W.2d 291.

## III. DISPOSITION

The petition for writ of mandate is denied, and the alternative writ discharged. The temporary stay is vacated. Petitioner is to bear the costs of this petition.

Boren, P. J., and Fukuto, J., concurred.

A petition for a rehearing was denied December 14, 1998, and petitioner's application for review by the Supreme Court was denied March 17, 1999.