# IN THE SUPREME COURT OF IOWA

No. 18–0335

Filed April 3, 2020

**DOUG OMMEN,** in His Capacity as Liquidator of CoOportunity Health, and **DAN WATKINS,** in His Capacity as Special Deputy Liquidator of CoOportunity Health,

Appellees,

vs.

STEPHEN RINGLEE, DAVID LYONS, and CLIFFORD GOLD,

Defendants,

and

**MILLIMAN, INC., KIMBERLEY HIEMENZ,** and **MICHAEL STRUM,**

Appellants.

Appeal from the Iowa District Court for Polk County, Jeanie K. Vaudt, Judge.

The defendants appeal the district court's denial of their motion to dismiss and compel arbitration. **REVERSED AND REMANDED WITH DIRECTIONS.**

Stephen H. Locher of Belin McCormick, P.C., Des Moines, Reid L. Ashinoff and Justin N. Kattan of Dentons US LLP, New York, New York, Stephen R. Eckley (until withdrawal), Matthew C. McDermott, and Christopher J. Jessen of Belin McCormick, P.C., Des Moines, for appellants.

Kirsten A. Byrd of Husch Blackwell LLP, Kansas City, Missouri, and Kevin J. Driscoll and John David Hilmes of Finley Law Firm, P.C., Des Moines, for appellees.

**CHRISTENSEN, Chief Justice.**

In 2014, a multimillion dollar Iowa-based health-insurance provider collapsed. The question we must answer is whether a court-appointed liquidator of the now-insolvent health insurer, pursuing common law tort claims against a third-party contractor, is bound by an arbitration provision in a preinsolvency agreement between the health insurer and the third-party contractor.

The plaintiff in this case is a court-appointed liquidator of an insolvent health-insurance provider. Prior to its insolvency, the health-insurance provider entered into an agreement with a third-party contractor for actuarial consulting services. The third-party contractor assisted the health-insurance provider in securing federal funding approval and setting rates. One year after the health-insurance provider began operations, it was declared insolvent and placed into liquidation.

The liquidator of the health-insurance provider filed a petition against the third-party contractor, asserting common law tort damages for preliquidation work the contractor performed under the agreement. The third-party contractor submitted a motion to dismiss and compel arbitration because the agreement between itself and the health-insurance provider contained an arbitration provision.

The district court denied the third-party contractor's motion. It determined that the liquidator's claims did not arise out of or relate to the agreement, that the Iowa Liquidation Act precludes arbitration of the liquidator's claims, and that the McCarran-Ferguson Act reverse preempts the Federal Arbitration Act (FAA). The third-party contractor appealed the judgment, and we retained the appeal.

On our review, we conclude the court-appointed liquidator is bound by the arbitration provision because, under the principles of contract law

and as pled, the liquidator stands in the shoes of the health-insurance provider and is bound by the preinsolvency arbitration agreement. Therefore, the liquidator's claims cannot be detached from the contractual relationship between the health-insurance provider and the third-party contractor, pursuant to which all of the preinsolvency work was performed. We also conclude the liquidator cannot use Iowa Code section 507C.21(*k*) (2017) to disavow a preinsolvency agreement that the third-party contractor already performed. Finally, in this case, the McCarran-Ferguson Act does not permit reverse preemption of the FAA when the liquidator asserts common law tort claims against a third-party contractor. Courts in other states have unanimously required liquidators to arbitrate their claims against the same third-party contractor under the same arbitration provision.

## I. Background Facts and Proceedings.

Because we are reviewing a ruling on a motion to dismiss, we take as true the petition's well-pled facts. *See Karon v. Elliot Aviation*, 937 N.W.2d 334, 335 (Iowa 2020); *Shumate v. Drake Univ.*, 846 N.W.2d 503, 507 (Iowa 2014).

Doug Ommen and Dan Watkins are court-appointed liquidators of the now-insolvent CoOportunity Health—an Iowa–based insurer.[1] CoOportunity was a nonprofit health insurer launched under the Affordable Care Act. In 2012, CoOportunity secured a $145 million federal start-up loan to launch the company. Member enrollment began in October 2013 and CoOportunity started the coverage of healthcare claims in January 2014. After one year of operation, CoOportunity faced significant financial distress; it reported $163 million in losses.

---

[1]We will refer to the court-appointed liquidators, Doug Ommen and Dan Watkins, as "the liquidator."

CoOportunity was declared insolvent and placed into liquidation by a Final Order of Liquidation on March 2, 2015.

The liquidator of CoOportunity filed a petition against Milliman and the founders of CoOportunity, asserting common law tort damages for preliquidation work Milliman performed for CoOportunity pursuant to a 2011 Consulting Services Agreement (2011 Agreement). Milliman is an actuarial and consulting firm. Before CoOportunity secured its $145 million loan, the federal government, on July 28, 2011, announced a funding opportunity inviting nonprofit health insurance companies, such as CoOportunity, to apply for federal funding. CoOportunity relied on Milliman to secure federal funding approval, set rates, and provide other actuarial work. On September 30, 2011, a CoOportunity founder signed the 2011 Agreement for Milliman to provide "consulting services" including "general actuarial consulting services." The liquidator's petition seeks to recover millions in losses sustained by CoOportunity "as a result of the professional negligence, breach of fiduciary duty, and reckless, willful, or intentional misconduct by the actuarial firm, Milliman, Inc."

Milliman submitted a motion to dismiss and compel arbitration pursuant to Iowa arbitration laws and the FAA. It indicated the liquidator's claims arose out of and related to its engagement by CoOportunity pursuant to the 2011 Agreement. The 2011 Agreement contained an arbitration provision which stated any dispute "will be resolved by final and binding arbitration."

The district court entered an order denying Milliman's motion to dismiss and compel arbitration. It determined the liquidator's claims did not arise out of or relate to the 2011 Agreement, the liquidator disavowed the 2011 Agreement, the Iowa Liquidation Act precluded arbitration of the

liquidator's claims against Milliman, and the McCarran-Ferguson Act reverse preempted the FAA.

Milliman appealed the district court's order, which we retained.

## II. Standard of Review.

The denial of a motion to compel arbitration is reviewed for correction of errors at law. *Bullis v. Bear, Stearns & Co.*, 553 N.W.2d 599, 601 (Iowa 1996); *see Heaberlin Farms, Inc. v. IGF Ins.*, 641 N.W.2d 816, 818, 823 (Iowa 2002).

## III. Analysis.

This case presents the novel issue of whether a court-appointed liquidator of a now-insolvent health insurer, pursuing common law tort claims against a third-party contractor, is bound by an arbitration provision in a preinsolvency agreement between the health insurer and the third-party contractor. The relevant portion of the arbitration provision in this case states,

> In the event of *any dispute* arising out of or relating to the engagement of Milliman by Company, *the parties agree that the dispute will be resolved by final and binding arbitration* under the Commercial Arbitration Rules of the American Arbitration Association.

(Emphasis added.) This written provision to resolve *any dispute* by arbitration is central to the issue before us. We must determine whether the parties are bound to that arbitration agreement. We note that courts in other jurisdictions have unanimously required the liquidator to honor the same arbitration provision in pursuing claims against Milliman. *Milliman, Inc. v. Roof*, 353 F. Supp. 3d 588, 603–04, 606 (E.D. Ky. 2018) (granting Milliman's petition to compel arbitration of the tort and contract claims brought against it by the liquidator of an insolvent Kentucky healthcare cooperative); *Donelon v. Shilling*, 2017 CW 1545, 2019 WL

993328, at *13–14 (La. Ct. App. Feb. 28, 2019) (reversing the district court's denial of Milliman's motion to compel arbitration and ordering arbitration of the Louisiana Insurance Commissioner's claims against Milliman); *State ex rel. Richardson v. Eighth Judicial Dist. Ct.*, No. 77682, 2019 WL 7019006, at *1 (Nev. Dec. 19, 2019) (order denying petition for writ of mandamus) (allowing Milliman's motion to compel arbitration to proceed and rejecting liquidator's argument that arbitrating her common law damages claims against Milliman would "thwart the insurance liquidator's broad statutory powers and the general policy under" Nevada law). We reach the same conclusion.

**A. Is the Liquidator Bound by the Preinsolvency Arbitration Agreement?** The thrust of the FAA, 9 U.S.C. §§ 1–14 (Supp. IV 2017), declares a written agreement to arbitrate in "a contract evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Id.* § 2. Essentially, section 2 of the FAA is a "congressional declaration of a liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24, 103 S. Ct. 927, 941 (1983). A party to the arbitration agreement may petition a court for an order to compel arbitration. 9 U.S.C. § 4; *Bullis*, 553 N.W.2d at 601. Where the arbitrability of a dispute between parties occurs in state court, as is the case here, the FAA governs. *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24, 103 S. Ct. at 941. According to the Supreme Court, the FAA "places arbitration agreements on an equal footing with other contracts, and requires courts to enforce them according to their terms." *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 67, 130 S. Ct. 2772, 2776 (2010) (citation omitted). States may regulate arbitration agreements under general principles of contract law,

and states may even invalidate arbitration agreements under the same grounds for the revocation of any contract. *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 281, 115 S. Ct. 834, 843 (1995). States, however, may not decide a contract is fair enough to enforce its terms but not fair enough to enforce its arbitration agreement. *Id.* That type of state policy is made unlawful by the FAA and would place arbitration agreements on an unequal footing with other contracts, contrary to the FAA's language and congressional intent. *Id.* Congress's intent, according to *Southland Corp. v. Keating*, is to "foreclose state legislative attempts to undercut the enforceability of arbitration agreements." 465 U.S. 1, 16, 104 S. Ct. 852, 861 (1984). Doubts about the scope of arbitrable issues are to be resolved in favor of arbitration. *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24–25, 103 S. Ct. at 941.

The liquidator asserts arbitration cannot be compelled because he did not sign the 2011 Agreement that contained the arbitration provision. The parties do not dispute the liquidator did not sign the 2011 Agreement. Instead of categorically banning nonsignatories from arbitration as the liquidator suggests, we believe the analysis depends on general principles of contract law. As we stated in *Bullis*, "Whether one is bound by an arbitration agreement that she did not sign depends on the general principles of contract law . . . ." 553 N.W.2d at 602; *see Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631, 129 S. Ct. 1896, 1902 (2009); *Rent-A-Ctr., Inc. v. Iowa Civil Rights Comm'n*, 843 N.W.2d 727, 732–33 (Iowa 2014).

Our caselaw discussing whether a court-appointed liquidator is bound to a preinsolvency arbitration agreement is sparse. In *Rent-A-Center*, we held the FAA's reach did not extend to a public agency that was not a party to the arbitration agreement nor "a stand-in for a party." 843

N.W.2d at 736. We looked to whether the agency's claims were "merely derivative" of the employee's claims and whether the agency simply " '[stood] in the employee's shoes' or act[ed] as a 'proxy' for the employee." *Id.* at 734 (quoting *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 297–98, 122 S. Ct. 754, 766 (2002)). Because the agency in *Rent-A-Center* was "acting in its prosecutorial capacity" and its claims were "independent of [the employee's] own claims, in order to protect the public interest," it was not bound to arbitration under the FAA. *Id.* at 737. The arbitration agreement between the employee and Rent-A-Center did not "displace any independent authority" the agency had "to investigate and rectify violations" of the Iowa Civil Rights Act. *Id.* at 741 (quoting *Preston v. Ferrer*, 552 U.S. 346, 359 n.7, 128 S. Ct. 978, 987 n.7 (2008)).

As the liquidator has pled his case against Milliman, the liquidator's claims are a derivative of another party's claims, in this case, CoOportunity.[2] More squarely on point is *Roth v. Evangelical Lutheran Good Samaritan Society*, 886 N.W.2d 601 (2016). There, we regarded a wrongful-death claim brought by a personal representative as a claim that stands in the shoes of the decedent, not as an independent claim. *Id.* at 608–09. We explained, "[W]hen a personal representative brings a *wrongful-death* action against a party with whom the decedent entered into a binding arbitration agreement, the case is subject to arbitration." *Id.* at 608. In Iowa, the wrongful death statute did not create a new cause of

---

[2]To the extent the liquidator attempts to bring the Department of Health and Human Services (HHS) or "state and federal regulators" within the ambit of its misrepresentation claims, those entities are not included in the limited statutory authority granted a liquidator to prosecute claims on behalf of specific insurer stakeholders. *See* Iowa Code § 507C.21(*m*) (granting liquidator authority to "[p]rosecute an action on behalf of the creditors, members, policyholders or shareholders of the insurer against an officer of the insurer, or any other person").

action in the decedent's survivors. *Id.* Rather, it preserved the rights and liabilities a decedent had at the time of his death. *Id.*

In this case, the liquidator's petition is on behalf of CoOportunity and seeks to recover damage for the financial loss to CoOportunity. The petition states the liquidator's action is to recover millions in losses sustained by CoOportunity "as a result of the professional negligence, breach of fiduciary duty, and reckless, willful, or intentional misconduct by the actuarial firm, Milliman, Inc." This authority is pursuant to the Final Order of Liquidation, which vests with the liquidator "the title to the property, contracts, and rights of action and the books and records of CoOportunity" and the right to "carry out all direct, indirect and/or related aspects of the liquidation of CoOportunity." What matters here is that in this petition the liquidator brings common law tort claims for alleged damages to CoOportunity.

It makes no difference that the liquidator frames the complaint in tort, because Milliman's alleged duties arise solely from the 2011 Agreement containing the arbitration provision.[3] Without the 2011 Agreement, Milliman would not have performed any work that could give rise to claims by the liquidator. The liquidator, standing in CoOportunity's shoes, may not avoid a contractual arbitration agreement merely by "casting its complaint in tort." *Sweet Dreams Unlimited, Inc. v.*

---

[3]*Cf. Donelon*, 2019 WL 993328, at *11 (distinguishing claims in that case against Milliman as actuary from breach of an auditor's statutory duties involved in *Taylor v. Ernst & Young, L.L.P.*, 958 N.E.2d 1203, 1210–12 (Ohio 2011), which did not require reference to contractual obligations to ascertain extent of duties). As in *Donelon*, the liquidator here identified no statutory duties owed by Milliman, but instead relied solely on Milliman's contractual relationship with CoOportunity and its accompanying contractual obligations to support each of his claims. To the extent the liquidator alleges generalized harm to CoOportunity's creditors or policyholders, the petition fails to identify any noncontractual duties owed by Milliman to those policyholders or creditors. We therefore have no occasion to consider whether nonparty tort claims would be subject to the contractual arbitration provision.

*Dial-A-Mattress Int'l, Ltd.*, 1 F.3d 639, 643 (7th Cir. 1993) (quoting *In re Oil Spill by "Amoco Cadiz" Off Coast of France Mar. 16, 1978*, 659 F.2d 789, 794 (7th Cir. 1981)); *see Chelsea Family Pharmacy, PLLC v. Medco Health Sols., Inc.*, 567 F.3d 1191, 1198 (10th Cir. 2009) ("Focusing on the facts rather than on a choice of legal labels prevents a creative and artful pleader from drafting around an otherwise-applicable arbitration clause."); *Hudson v. ConAgra Poultry Co.*, 484 F.3d 496, 499–500 (8th Cir. 2007) ("Under the Federal Arbitration Act, we generally construe broad language in a contractual arbitration provision to include tort claims arising from the contractual relationship[.]"); *Taylor v. Ernst & Young, L.L.P.*, 958 N.E.2d 1203, 1222 (Ohio 2011) (O'Donnell, J., concurring in part and dissenting in part) ("[T]he duties imposed by Ohio law that E & Y allegedly failed to perform are the same as those set forth in the engagement letter, and whether cast in tort or contract, the issue is one that falls within the broad scope of the arbitration provision.").[4]

---

[4]In *Taylor*, the Ohio Supreme Court majority held that the liquidator was not required to arbitrate because his claims did not "arise from the contract containing the arbitration clause." 958 N.E.2d at 1213 (majority opinion). The same opinion recognizes the converse that liquidators are bound to arbitrate when asserting claims arising from a contract requiring arbitration. *Id.* at 1214. That is what we have here. Indeed, as the Ohio Supreme Court has held, "it would be inequitable to allow [the liquidator] to avoid arbitration while simultaneously seeking a substantive benefit of the contract that contained the arbitration clause." *Id.*; *Gerig v. Kahn*, 769 N.E.2d 381, 385–86 (Ohio 2002) (enforcing arbitration agreement against nonsignatory liquidator); *Covington v. Lucia*, 784 N.E.2d 186, 190–91 (Ohio Ct. App. 2003) ("The overriding principle in *Gerig*, and the cases cited therein, is that when seeking to enforce rights under a contract, a nonsignatory can be bound by that contract's arbitration clause.").

Courts have noted insurance liquidators act for the public interest. *See, e.g.*, *Mitchell v. Taylor*, 43 P.2d 803, 804 (Cal. 1935) (en banc); *Arthur Andersen v. Super. Ct.*, 79 Cal. Rptr. 2d 879, 882 (Ct. App. 1998). But those cases did not involve claims arising from an insolvent insurer's agreement with a third party that included an arbitration clause. Neither the Iowa legislature nor the Iowa Insurance Commissioner has prohibited health insurance co-ops from including arbitration provisions in contracts with third-party contractors such as Milliman. *See, e.g.*, Iowa Code § 505.8. It is too late for the liquidator to impose such a provision in this case. The liquidator, having stepped into the shoes of CoOportunity, cannot now after-the-fact cherry-pick his agreement with Milliman and decide he is bound only by the parts he likes.

Here, the arbitration provision is broad: "In the event of *any dispute* arising out of or relating to the engagement of Milliman by Company" the parties agree to arbitrate. (Emphasis added.) In light of the arbitration provision's general breadth, we have no reason to believe the parties somehow meant to exclude postinsolvency disputes from arbitration. *See Quackenbush v. Allstate Ins.*, 121 F.3d 1372, 1380 (9th Cir. 1997); *Bennett v. Liberty Nat'l Fire Ins.*, 968 F.2d 969, 972 (9th Cir. 1992) ("[B]ecause the liquidator, who stands in the shoes of the insolvent insurer, is attempting to enforce [the insolvent insurer's] contractual rights, she is bound by [the insolvent insurer's] pre-insolvency [arbitration] agreements." (Footnote omitted.)).

Where the language of the arbitration provision is broad, a claim will proceed to arbitration if the underlying allegations "simply touch" matters covered by the provision. *Leonard v. Del. N. Cos. Sport Serv., Inc.*, 861 F.3d 727, 730 (8th Cir. 2017) (quoting *Unison Co. v. Juhl Energy Dev., Inc.*, 789 F.3d 816, 818 (8th Cir. 2015)). The liquidator's claims arise out of and relate to the work Milliman completed pursuant to the 2011 Agreement with CoOportunity. The petition sets forth claims that relate to either Milliman's actuarial consulting services or to a conflict of interest in the 2011 Agreement. For instance, the liquidator's petition states,

> CoOportunity retained the Milliman Defendants to provide actuarial professional services for purposes of working on critical aspects of the company's plans, including initial and later federal funding applications, rate setting, and financial reporting to federal and state regulators.
>
> . . . .
>
> The terms of the agreement between CoOportunity and Milliman created an improper incentive for Milliman to convince federal officials to approve and fund the project. . . . The improper financial motivation compromised Milliman's objectivity and independence in certifying the feasibility study and business plan.

Milliman did not disclose [its] financial interest in CoOportunity (and the other CO-Ops) receiving federal funding approval or its potential conflict of interest to HHS . . . .

The liquidator's claims cannot be detached from the contractual relationship between Milliman and CoOportunity, pursuant to which all of the work was performed. Therefore, under the principles of contract law, we conclude the liquidator stands in CoOportunity's shoes; his claims are merely derivative of CoOportunity's claims. *See Roth,* 886 N.W.2d at 608; *Rent-A-Ctr.,* 843 N.W.2d at 736. Accordingly, the liquidator is bound by the preinsolvency arbitration agreement. *See Donelon,* 2019 WL 993328, at *9 (holding that the Louisiana Insurance Commissioner, despite being a nonsignator, is bound by Milliman's arbitration agreement).

Our conclusion is in accordance with federal jurisprudence, holding that a state insurance liquidator must arbitrate common law damages claims asserted against third-party contractors for preinsolvency work pursuant to an agreement. *See, e.g., Suter v. Munich Reins.,* 223 F.3d 150, 161–62 (3d Cir. 2000); *Quackenbush,* 121 F.3d at 1382; *Bennett,* 968 F.2d at 970; *Milliman, Inc.,* 353 F. Supp. 3d at 603–04.

**B. Can the Court-Appointed Liquidator Disavow the 2011 Agreement Pursuant to Iowa Code Section 507C.21(*k*)?** The liquidator alternatively claims arbitration cannot be compelled because Iowa law permits the court-appointed liquidator to disavow the entire 2011 Agreement. Pursuant to the Iowa Liquidation Act, the liquidator may "[e]nter into contracts as necessary to carry out the order to liquidate *and affirm or disavow contracts to which the insurer is a party.*" Iowa Code § 507C.21(*k*) (emphasis added). The liquidator attempts to shoehorn the power to disavow a contract into the FAA's "grounds as exist at law" language for the revocation of any contract. *See* 9 U.S.C. § 2. However,

permitting the liquidator to disavow the entire 2011 Agreement may run afoul of the FAA's mandate to place arbitration agreements on an equal footing with other contracts. *See Allied-Bruce Terminix Cos.*, 513 U.S. at 281, 115 S. Ct. at 843. The issue with the liquidator's position is that it attempts to disavow a contract that Milliman *already* performed. The 2011 Agreement does not vanish. Milliman rendered its consulting services under the 2011 Agreement, and the rights established under that contract still exist. It is difficult to reconcile the ability of the liquidator to disavow the 2011 Agreement while still retaining the ability to assert claims against Milliman pursuant to the same contract. *See Costle v. Fremont Indem. Co.*, 839 F. Supp. 265, 272 (D. Vt. 1993) ("[I]f a liquidator seeks to enforce an insolvent company's rights under a contract, she must also suffer that company's contractual liabilities."); *Taylor*, 958 N.E.2d at 1221 (O'Donnell, J., concurring in part and dissenting in part) ("[T]he liquidator cannot prosecute an action for breach of contract or one involving a contract on the authority conferred in [the Ohio Liquidation Act] and yet seek to escape arbitration by disavowing an arbitration provision contained in that contract pursuant to [the Ohio Liquidation Act].").

Disavowing the entire 2011 Agreement, while allowing the liquidator to assert claims pursuant to the same agreement, amounts to nothing more than singling out the arbitration provision for evasion. The liquidator cannot pick and choose which provisions in the contract existed. To avoid treating the arbitration provision as "suspect status," and to place the provision on equal footing as other contracts, the liquidator cannot be permitted to disavow the 2011 Agreement under Iowa Code section 507C.21(*k*). *See Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687, 116 S. Ct. 1652, 1656 (1996). Moreover, if section 507C.21(*k*) were interpreted

to allow disavowal of a preinsolvency arbitration agreement with a third-party contractor, "this would raise serious questions as to its validity under the Supremacy Clause of the United States Constitution," as we explained in *Roth.* 886 N.W.2d at 611.

**C. Does the McCarran-Ferguson Act Permit Reverse Preemption of the FAA?** We must also consider the McCarran-Ferguson Act. 15 U.S.C. §§ 1011–15. McCarran-Ferguson establishes "reverse preemption," where state law preempts federal law. This federal statute says,

> No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance. . . .

*Id.* § 1012(b). For reverse preemption to apply, (1) the federal statute must not specifically relate to the business of insurance, (2) the state statute must have been enacted for the purpose of regulating the business of insurance, and (3) the federal statute would, "invalidate, impair, or supersede" the state statue. *Munich Am. Reins. Co. v. Crawford*, 141 F.3d 585, 590 (5th Cir. 1998). We will discuss the three factors as necessary.

The district court, agreeing with the liquidator, found the Iowa Liquidation Act required the liquidator's claims be resolved in a public forum of the liquidator's choosing, subject to the rules and procedures established by the Iowa legislature. The liquidator asserts requiring arbitration under the FAA would "invalidate, impair, or supersede" operation of the Iowa Liquidation Act. Milliman, on the other hand, questions whether there is any conflict between the FAA and the Iowa Liquidation Act. If there is no conflict, McCarran-Ferguson's reverse preemption is inapplicable. *See id.*

The Iowa Liquidation Act authorizes the liquidator to "[c]ontinue to prosecute and to institute . . . any and all suits and *other legal proceedings.*" Iowa Code § 507C.21(1)(*l*) (emphasis added). Pursuant to the Iowa Liquidation Act, the Final Order of Liquidation in this case expressly permits the liquidator to sue or defend CoOportunity in "any necessary forum," including "arbitration panels."

> The Liquidator and the Special Deputy are hereby authorized to deal with the property, business and affairs of CoOportunity and CoOportunity's estate, *and, in any necessary forum, to sue or defend for CoOportunity*, or for the benefit of CoOporunity's policyholders, creditors and shareholders *in the courts and tribunals, agencies or arbitration panels* of this state and other states or in any applicable federal court in the Liquidator's name as Commissioner of Insurance of the State of Iowa, in his capacity as Liquidator, or the Special Deputy in his capacity as Special Deputy Liquidator, or in the name of CoOportunity Health.

(Emphasis added.) The liquidator claims enforcing the arbitration agreement under the FAA would frustrate the policy of the Iowa Liquidation Act and strip the authority to prosecute claims in a transparent, public forum. The Iowa legislature stated the purpose of the Iowa Liquidation Act as follows:

> The purpose of this chapter is the protection of the interests of insureds, claimants, creditors, and the public, with minimum interference with the normal prerogatives of the owners and managers of insurers, through all of the following:
>
>     *a.* Early detection of a potentially dangerous condition in an insurer and prompt application of appropriate corrective measures.
>
>     *b.* Improved methods for rehabilitating insurers, involving the cooperation and management expertise of the insurance industry.
>
>     *c.* Enhanced efficiency and economy of liquidation, through clarification of the law, to minimize legal uncertainty and litigation.

>    *d.* Equitable apportionment of any unavoidable loss.
>
>    *e.* Lessening the problems of interstate rehabilitation and liquidation by facilitating cooperation between states in the liquidation process, and by extending the scope of personal jurisdiction over debtors of the insurer outside this state.
>
>    *f.* Regulation of the insurance business by the impact of the law relating to delinquency procedures and substantive rules on the entire insurance business.
>
>    *g.* Providing for a comprehensive scheme for the rehabilitation and liquidation of insurance companies and those subject to this chapter as part of the regulation of the business of insurance, the insurance industry, and insurers in this state. Proceedings in cases of insurer insolvency and delinquency are deemed an integral aspect of the business of insurance and are of vital public interest and concern.

Iowa Code § 507C.1(4)(*a*)–(*g*).

We disagree with the liquidator that requiring arbitration under the FAA would invalidate, impair, or supersede operation of the Iowa Liquidation Act. Nowhere in the Iowa Liquidation Act is it required that the liquidator must bring claims in a public forum. The opposite of the liquidator's assertion is true. Iowa granted the liquidator power to prosecute suits and "other legal proceedings." *See id.* § 507C.21(1)(*l*). The liquidator's power to prosecute other legal proceedings is recognized in the Final Order of Liquidation, which specifically contemplates that the liquidator may sue or defend CoOportunity in "arbitration panels." In fact, the Iowa Liquidation Act does not prohibit arbitration of the liquidator's claims against Milliman. The liquidator frames the issue as whether enforcing arbitration under the FAA "invalidates, impairs, or supersedes the enforcement of the state process designed to protect the interests of policyholders." *Davister Corp. v. United Republic Life Ins.*, 152 F.3d 1277, 1282 (10th Cir. 1998). The case before us, however, does not involve the disposition of claims by policyholders. *Cf. U.S. Dep't of Treasury v. Fabe,*

508 U.S. 491, 508, 113 S. Ct. 2202, 2212 (1993) (holding the Ohio priority statute, "to the extent that it regulates policyholders," was exempt from preemption, but priority given to employees and general creditors was not free from preemption under the McCarran-Ferguson Act). The liquidator is not litigating on behalf of policyholders, and we are not persuaded that any indirect effects on the policyholders are sufficient to avoid preemption under the McCarran-Ferguson Act. The *Fabe* court noted the indirect-effects argument "goes too far." *Id.* "[I]n that sense, every business decision made by an insurance company has some impact on its reliability . . . and its status as a reliable insurer." *Id.* (quoting *Grp. Life & Health Ins. v. Royal Drug Co.*, 440 U.S. 205, 216–17, 99 S. Ct. 1067, 1076 (1979)).

CoOportunity's liquidator brings common law tort claims against a third-party contractor. Requiring arbitration only alters the forum in which the liquidator may pursue his common law tort claims. The interests and rights of policyholders under Iowa's statutory scheme are not altered. *See Milliman*, 353 F. Supp. 3d at 603 (rejecting reverse-preemption and stating that "[m]andating arbitration in this case does not alter the disposition of claims of the policy holders and does not 'invalidate, impair, or supersede' the [Kentucky Liquidation Act] as a whole").

The arbitration forum does not impede the liquidator's ability to conduct an orderly dissolution. Discovery, including depositions, are permitted in the arbitration proceedings. The liquidator can bring the same claims in arbitration as it asserted in district court, and the liquidator has identified no procedural impediments to a full recovery in arbitration. Moreover, the FAA leaves no discretion with the district courts "to consider public-policy arguments in deciding whether to compel arbitration under the FAA." *Quackenbush*, 121 F.3d at 1380, 1382. In

short, there is no conflict here between the FAA and the Iowa Liquidation Act. Accordingly, in this case, we hold the McCarran-Ferguson Act does not permit reverse preemption of the FAA.

**IV. Conclusion.**

For the aforementioned reasons, we hold the court-appointed liquidator of a now-insolvent health insurer, pursuing common law tort claims against a third-party contractor, is bound by an arbitration provision in a preinsolvency agreement between the health insurer and the third-party contractor. We reverse the district court judgment and remand the case with directions to enter an order compelling arbitration.

**REVERSED AND REMANDED WITH DIRECTIONS.**

All justices concur except Appel, J., who dissents.

**APPEL, Justice (dissenting).**

I respectfully dissent. The majority holds that the Iowa insurance commissioner's effort to sue a consulting firm allegedly responsible for the insolvency of a provider of an Iowa health insurance to the public under the Affordable Care Act will be decided by a panel of private arbitrators in New York applying New York law under the terms of an private insider agreement rather than by an Iowa judge and jury in an Iowa courtroom applying Iowa law. The majority holds that a private insider agreement between the insurer and its consultants, which dramatically limits the potential liability of the consultants to the detriment of policyholders and the public, is binding on the state's chief regulator, the insurance commissioner, in a liquidation proceeding under Iowa Code chapter 507C even though the insurance commissioner was not a party to the private insider agreement. Further, the majority enforces the private insider agreement even though the insurance commissioner has exercised the power given to him by the legislature to disavow the contract.

The panel of private arbitrators which the majority believes should decide the insurance commissioner's case will not be required to permit broad discovery that the insurance commissioner would be entitled to under Iowa law. The private arbitrators will meet in New York and will be required to apply the law of New York, not the law of Iowa. The private arbitrators meeting in New York and applying New York law will determine whether to enforce strict limitations on damages provided in the private insider agreement between the founders of the failed health insurance company and its professional consultants. The private arbitrators will decide disputed questions of law and fact. If they follow the terms of the private insider agreement, they will be precluded from awarding punitive

damages. Once the panel or arbitrators operating in private have made their decision under New York law, the insurance commissioner will have only strictly limited rights to appeal the privately determined decision.

Enforcement of the arbitration provision of the private insider agreement thus establishes a very favorable terrain for the insider consultants at the expense of the insureds, creditors, and the public. A person on the street would understandably see the application of the private insider agreement against the insurance commissioner as an example of the big shots protecting themselves, while the public gets the shaft.

If this were simply a private business dispute between signatories to an agreement requiring arbitration, the sending of this matter to New York for a private arbitration under New York law with limited discovery and tightly curtailed remedies might not be objectionable. But this is not an inconsequential private dispute between signatories to an agreement that may properly be decided in confidential proceedings in some New York high-rise.

This case is infused to the bone with public policy considerations arising from the catastrophic failure of a health insurance entity under the Affordable Care Act. Indeed, the provision of healthcare through insurance carriers under the Affordable Care Act is one of the most incandescent public policy issues of our time. Here, the insurer somehow allegedly managed to lose $163 million in its first year of operation, became insolvent in short order, and left thousands of policyholders to scramble to obtain alternate coverage.

The public, through the Iowa insurance commissioner, a nonsignatory to the contract including the arbitration provision, seeks to hold those allegedly responsible accountable in a public proceeding in an

Iowa courtroom pursuant to the commissioner's broad and comprehensive authority granted by the legislature in the broad and comprehensive provisions of Iowa Code chapter 507C governing the liquidation of insurance companies. Because the insurance commissioner is a public official charged with vindicating public interests, he does not simply "stand in the shoes" of the insurer in a way that allows the arbitration provision to which the commissioner never agreed to be enforced against him. And, in any event, the commissioner has exercised the power given to him by the legislature to disavow the private insider contract which the majority now seeks to enforce.

Here, the insurance commissioner has launched a claim against an insider claiming, among other things, malpractice, misrepresentation, breach of fiduciary duty, and fraud in connection with the creation and operation of a health insurer in the state of Iowa. The public interest in this kind of litigation is enormous. Yet, the majority sees this dispute over the failure of a health insurer and the resulting public carnage as a controversy for private and secret resolution through an unaccountable private arbitrator outside the comprehensive regulatory framework adopted by the Iowa General Assembly for liquidation of insurers.

Does the law support this startling result? The answer is no.

First, the insurance commissioner as liquidator is unlike a receiver under the Bankruptcy Code, but is a public officer who acts on behalf of "insureds, claimants, creditors [largely healthcare providers], and the public." Iowa Code § 507C.1(4) (2017). The legislature named the insurance commissioner as liquidator for a reason, namely, to see that a publically accountable officer is responsible to see that the public interest, and not that of insiders like Milliman, are zealously protected. The majority fails to place Iowa's insurance liquidation statute in the context

of the long history of intense public regulation of the insurance industry. The insurance commissioner does not stand in the shoes of CoOportunity, but stands in the shoes of the public. Unlike a private wind-down of a bankrupt local pawnshop, the liquidation of an insolvent insurance company is the public's business.

As a result, the insurance commissioner as liquidator does not merely stand in the shoes of the insurer but represents broader public interests. As liquidator, the insurance commissioner is acting within the scope of his official duties as a public official. He is charged with protecting not the insolvent insurance entity, but "the insured, claimants, creditors, and the public." *Id.* The insurance commissioner is thus not bound by an arbitration provision in a private insider agreement to which the commissioner is not a party.

But if there is any doubt, there is a second and equally powerful reason to affirm the district court. The legislature in Iowa Code section 507C.21(1)(*k*) provided the insurance commissioner with an extraordinary power, the power to "disavow contracts to which the insurer is a party." In other words, private ordering by third parties and the insurer is not binding on the insurance commissioner. In disavowing a contract, the insurance commissioner does not stand in the shoes of a private party who has no power to generally disavow contracts, but in the shoes of the public.

Importantly, the legislature chose to vest the insurance commissioner with this extraordinary power to disavow contracts entered into by the insurance company without qualification. *Id.* It could, of course, have limited that power to *executory* contracts, as it has repeatedly done in other contexts, but it chose not to do so. The broad power to "disavow contracts" is a manifestation of what before today has been

universally recognized, namely, the strong public interest in all aspects of the insurance business.

Further, the legislature made clear that the provisions of the chapter "shall be liberally construed to effect the purpose" of the chapter, namely, "protection of the interests of the insureds, claimants, creditors, and the public." Iowa Code § 507C.1(3)-(4). Protection of the interests of "insureds, claimants, creditors, and the public" is exactly what the insurance commissioner seeks to do in this case as he seeks to hold accountable insiders who, allegedly, contributed to the demise of the entity.

But the majority ignores the legislative direction to narrowly construe the disavowal language to protect the insider, Milliman, from public accountability. The majority drives resolution of the important issues in this case into the hand of a private arbitrator by affirmatively amending the statute by careting in a nonexistent qualifier to limit the insurance commissioner's power to disavow to "*executory* contracts." But such a limitation, of course, is totally absent from the statutory provision. Any such material narrowing of the broad powers of the insurance commissioner must await legislative action. In this populist age with abiding concerns about insider privileges, the prospects of such an insider-protecting amendment seem rather slim. This court has no business amending a statute that the political process has declined to correct.

In light of the unqualified power of the insurance commissioner to disavow contracts, the majority understandably resorts to another ground, namely, that the disavowal by the insurance commissioner, even if authorized by the plain language of Iowa Code section 507.21(1)(*k*), violates the Federal Arbitration Act (FAA). There is federal caselaw

indicating that a state statute that *discriminates* against arbitration clauses violates the FAA. But, the broad and unqualified disavowal provision of Iowa Code section 507C.21(1)(*k*) does not discriminate against arbitration provisions in a way that contravenes even the extraordinarily muscular interpretations of the FAA by the United States Supreme Court.

And, federal law has affirmatively protected the ability of states to engage in the regulation of the business of insurance through enactment of the sweeping McCarran-Ferguson Act. Under the McCarran-Ferguson Act, "[n]o Act of Congress shall be construed to invalidate, impair or supersede any law enacted by any State for the purpose of regulating the business of insurance. . . ." 15 U.S.C. § 1012(b) (Supp. IV 2017). McCarran-Ferguson has been interpreted to require "reverse preemption," namely that the reach of any act of Congress is preempted in the face of a state's regulation of the business of insurance.

A threshold question under McCarran-Ferguson is whether the liquidation of an insurance company by the insurance commissioner is "for the purpose of regulating the business of insurance." The Iowa legislature certainly thinks so. The legislature declared that proceedings in cases of insurance insolvency "are deemed an integral aspect of the business of insurance." Iowa Code § 507C.1(4)(*g*). That conclusion seems unassailable in light of the comprehensive scheme provided for the liquidation of insurance companies under Iowa Code chapter 507C. As a result, to the extent there is a conflict between Iowa Code section 507C.21(1)(*k*) and the FAA, it is the FAA, and not the Iowa statutory provision regulating the business of insurance, that would be unenforceable.

Further, for reasons that will be explained below, the sending of this important public litigation off to New York will substantially frustrate the

ability of the Iowa insurance commissioner to implement the provisions of Iowa Code chapter 507C. As a result, the insider private agreement cannot be enforced through application of the FAA; instead, to the extent there is a conflict, the FAA is reversed preempted by the provisions of Iowa law.

For these reasons, the district court refused to dismiss the action brought by the insurance commissioner and send the file off to a private arbitrator in New York City to apply New York state law. The district court got it right. For those not yet convinced, here are the details.

## I. Factual and Procedural Background.

**A. Overview of the Amended Petition.** The Iowa insurance commissioner brought an amended petition in Polk County district court against Milliman, Inc., two of its actuaries, and three individuals alleged to be the founders of a failed insurance company called CoOportunity Health, Inc. The more than fifty-page petition details the failure of CoOportunity and alleges a total of ten causes of action against the defendants. The insurance commissioner demanded a jury trial in the amended petition.

According to the petition, CoOportunity was one of twenty-three entities established throughout the United States under the Affordable Care Act. The entity was organized under Iowa law and headquartered in West Des Moines. CoOportunity opened for enrollment in October of 2013 and started covering health claims in January 2014.

CoOportunity was in business for only about a year. During that period of time, the insurance commissioner alleged that the business suffered catastrophic losses totaling $163 million dollars. The insurance commissioner ultimately obtained a liquidation order from the district court to deal with the insolvent entity.

Counts I through IV of the amended petition alleged that the Milliman defendants engaged in professional malpractice, breached fiduciary duties, made negligent misrepresentations, and engaged in intentional and willful or reckless misrepresentations. Counts V through X of the amended petition alleged that the founders breached fiduciary duties as founders; aided and abetted the breach of fiduciary duty by the Milliman defendants; engaged in a conspiracy to commit Milliman's wrongful failure to meet the standard of care by ignoring the true financial condition of CoOportunity; were negligent and failed to act in the best interest of the insurer, policyholders and creditors; received preferential payments in the form of bonus and severance payments; and engaged in prepetition fraudulent transfers.

Under the majority's approach in this case, counts I through IV alleging breach of various duties by the Milliman defendants would be resolved in New York arbitration, while the Iowa insurance commissioner's claims that the founders aided and abetted Milliman's breach of duties and conspired with Milliman to commit various wrongs would be tried in Iowa district court.

**B. The Consulting Services Agreement.** During the organizational phase of CoOportunity, Milliman and the founders signed a "Consulting Services Agreement." Milliman was to provide actuarial and consulting services in connection with the business. The private insider agreement was signed by one of the founders and a representative of Milliman.

The private insider agreement limited the liability of Milliman under any theory of law, including negligence, tort, breach of contract, or otherwise, to three times the professional fee paid to Milliman. The limitation did not apply, however, to cases involving intentional fraud or willful misconduct of Milliman. The private insider agreement declared

that the arbitrators lacked the power to impose punitive or exemplary damages.

The private insider agreement also markedly limited the liability of the founders to Milliman. The founders were not liable for any of Milliman's fees "in the event that the health cooperative is dissolved and does not receive funds to become a going concern." The private agreement provided that any disputes would be resolved by a panel of three arbitrators pursuant to the commercial arbitration rules of the American Arbitration Association. Under the private agreement, the arbitrators have the authority "to permit limited discovery." The arbitrators have the power to shift costs and attorney fees to "the prevailing party." The arbitration "shall be confidential, except as required by law."

The consulting services agreement provided that the construction, interpretation, and enforcement of the agreement "shall be governed by the substantive contract law of the State of New York without regard to its conflict of laws provisions." As a result, under the terms of the private insider agreement, the arbitrators could apply New York state law even though the forum had no nexus whatsoever to the underlying facts and, under the conflicts law of the State of New York, the law of the State of Iowa would normally apply.

**C. District Court Ruling.** The Milliman defendants moved to dismiss the claims against them and sought an order compelling arbitration pursuant to the consulting services agreement. The district court denied the relief sought by Milliman.

According to the district court, the arbitration provision in the private insider agreement signed by Milliman and a representative of the founders did not bind the statutory liquidator. According to the district court, the insurance commissioner as liquidator did not merely stand in

the shoes of CoOportunity but had a broad grant of authority to protect policyholders and creditors by bringing claims. Accordingly, the liquidator was not bound by the arbitration provision of the consulting services agreement.

The district court further noted that the liquidator had disavowed the consulting services agreement in its entirety as authorized by Iowa Code section 507C.21(l)(*k*). The district court rejected the argument of the Milliman defendants that the disavowal authority extended only to "executory contracts."

Finally, the district court found that the provisions of Iowa Code chapter 507C expressly involve "the business of insurance" and that the case falls within the meaning of the phrase in United States Supreme Court precedent. As a result, the district court declined to compel arbitration of the matter under the FAA because "the McCarran-Ferguson Act reverse preempts the FAA and . . . the rights and remedies in Iowa Code Chapter 507C prevail."

The Milliman defendants appealed.

**II. Because the Insurance Commissioner as Liquidator Is Acting on Behalf of the Public and Not a Receiver Simply Standing in the Shoes of the Insolvent Insurer, the Judgment of the District Court Should Be Affirmed.**

**A. Strong Public Interest in the Business of Insurance.** To begin with, it has long been recognized that contracts of insurance do not simply involve the two parties directly involved, but also affect vital public interests. A leading insurance authority puts it this way: "Insurance is a highly regulated industry due to its well-recognized importance to the public interest." 1 Steven Plitt et al., *Couch on Insurance* § 2:1 (3d ed.), Westlaw (database updated Dec. 2019) (footnote omitted). As noted by the United States Supreme Court, "Government has always had a special

relation to insurance." *Osborn v. Ozlin*, 310 U.S. 53, 65, 60 S. Ct. 758, 763 (1940). The Supreme Court later observed that a state's police power "extends to all the great public needs" and "is peculiarly apt when the business of insurance is involved—a business to which the government has long had a 'special relation.' " *Cal. State Auto. Ass'n Inter-Ins. Bureau v. Maloney*, 341 U.S. 105, 109, 71 S. Ct. 601, 603 (1951) (first quoting *Noble State Bank v. Haskell*, 219 U.S. 104, 111, 31 S. Ct. 186, 188 (1911); and then quoting *Osborn*, 310 U.S. at 65, 60 S. Ct. at 763). *See generally* Karl L. Rubinstein, *The Legal Standing of an Insurance Insolvency Receiver: When the Shoe Doesn't Fit*, 10 Conn. Ins. L.J. 309, 314–15 (2004) [hereinafter Rubinstein, *Legal Standing*]. An insurance contract is not an arm's-length sale of a peppercorn where market forces may be left alone.

**B. Government Interest in Insurance Insolvency Beyond Narrow Interest of Insurer.** A small dose of historical perspective will demonstrate the public interest in the liquidation of insurance companies. Prior to 1898, insurance insolvencies were subject to federal bankruptcy proceedings and thus treated like any other business failure. The 1898 Bankruptcy Act removed insurance insolvencies from bankruptcy proceedings, thereby recognizing that insurance was affected by the public interest, regulated by state regulators with specialized knowledge and expertise, and better handled by state insurance receivers than bankruptcy trustees. *See* Jeffrey E. Thomas & Susan Lyons, *The New Appleman on Insurance Law Library Edition* § 96.01[1], at 96-3 (2018).

State regulatory frameworks enacted after 1898 differ materially from those in ordinary bankruptcy proceedings.

> [B]ecause insurance is affected by a public purpose and enforced through the state's police powers, policyholders are treated more favorably than other unsecured creditors. Bankruptcy law distinguishes between secured and

unsecured creditors and does not afford favorable treatment to policyholders.

*Id.* § 96.01[2], at 96-5 to 96-6.

In other words, the fact that an insurance company crosses into insolvency does not eliminate the public interest in the business of insurance. As noted by the United States Supreme Court, "[The] solvency [of insurers] are of great concern . . . [and the potential impact of insolvency] demonstrates the interest of the public in it." *German All. Ins. v. Lewis*, 233 U.S. 389, 413, 34 S. Ct. 612 (1914). According to Couch, "The state has an important and vital interest in the liquidation of an insolvent insurance company." 1 Steven Plitt et al., *Couch on Insurance* § 5:35. Indeed,

> [t]he solvency of insurers is . . . a matter of vital public concern both in regard to preventing insurer insolvencies and in regard to handling them when they do occur. . . . The injury to policyholders, third party claimants, general creditors, shareholders and the general public is very serious even in the smallest of cases.

Rubinstein, *Legal Standing*, 10 Conn. Ins. L.J. at 315. As stated by one observer, "State regulation of insurers is a 'cradle-to-grave process,' commencing with the licensing of an insurer and, in cases of business failure, terminating with receivership proceedings in state court and, in certain instances, dissolution." Philip A. O'Connell et al., *Insurance Insolvency: A Guide for the Perplexed*, 27 No. 14 Ins. Litig. Rep. 669 (2005).

Notably as in the allegations in this case,

> [i]nsurer insolvencies most frequently result from acts or omissions that either overstate its assets, understate its liabilities, or both. . . . Whether inept or intentional, the fault is often that of corporate management, but sometimes a substantial share of the fault is upon third parties who have acted in concert with management.

Rubinstein, *Legal Standing*, 10 Conn. Ins. L.J. at 315. It is in precisely the kind of case before the court here that the public interest in enforcement of tort law is very high.

**C. Protection of Public Interest in Iowa Code Chapter 507C.** Because of the intense public interest in the proper handling of insurance insolvency, the National Association of Insurance Commissioners first proposed the Uniform Insurer's Liquidation Act and later, the Insurers Rehabilitation and Liquidation Model Act. Rubinstein, *Legal Standing*, 10 Conn. Ins. L.J. at 317. Iowa has enacted a version of the Model Act in Iowa Code chapter 507C.

Under the Iowa version, only the insurance commissioner, or a designee of the insurance commissioner, can be appointed as liquidator. As liquidator, the insurance commissioner is acting in his official capacity as an officer of the state. Courts have emphasized that the insurance commissioner in the insolvency context acts for the benefit of the general public, as well as policyholders and creditors. *See, e.g.*, *20th Century Ins. v. Garamendi*, 878 P.2d 566, 580 (Cal. 1994) (en banc); *Mitchell v. Taylor*, 43 P.2d 803, 804 (Cal. 1935); Rubinstein, *Legal Standing*, 10 Conn. Ins. L.J. at 318. If the legislature did not see liquidation of an insurance company as infused with the public interest, it could have allowed the appointment of a private individual to wind down the affairs of the insurance company. But the legislature made a deliberate choice not to do that.

Iowa Code chapter 507C vests the insurance commissioner with sweeping powers in liquidation proceedings. Under Iowa Code section 507C.42(2), after costs and administration of expenses, claims of policy holders are given top priority in a liquidation. This special priority rule reflects the importance of protecting rights of the public over other

claimants, particularly corporate insiders. Iowa Code section 507C.21(1)(*k*) authorizes the insurance commissioner to affirm or disavow contracts, a very powerful provision not available to a private party. The power to disavow contracts is a tool to allow the insurance commissioner to advance the public interests by the rejection of ill-advised contracts into which the insurer may have entered. Finally, Iowa Code section 507C.21(1)(*m*) authorizes the insurance commissioner to bring litigation "on behalf of creditors, members, policyholders, or shareholders" against any persons.

These strong provisions demonstrate that the insurance commissioner as liquidator works for the general public and not simply as a successor to the insolvent insurer. Certainly the legislature thinks so. For instance, Iowa Code section 507C.1(4) declares that the purpose of the liquidation chapter "is the protection of the interests of insured, claimants, creditors, and the public." The purposes are to be achieved, among other things, through "[e]quitable apportionment of any unavoidable loss." Iowa Code § 507C.1(4)(*d*). Of course, the insurance commissioner is seeking to equitably apportion the loss through prosecution of its action against Milliman. Further, the legislature had declared in Iowa Code section 507C.1(4)(*g*) that the purpose of the chapter is accomplished, in part, by

> [p]roviding for a comprehensive scheme for the rehabilitation and liquidation of insurance companies and those subject to this chapter as part of the regulation of the business of insurance, the insurance industry, and insurers in this state. Proceedings in cases of insurer insolvency and delinquency *are deemed an integral aspect of the business of insurance and are of vital public interest and concern.*

*Id.* (emphasis added). The proposition that the insurance commissioner acting as liquidator acts as a public officer, and not merely as a private representative, was well recognized in the California case of *Arthur*

*Andersen LLP v. Superior Court,* 79 Cal. Rptr. 2d 879 (Ct. App. 1998). In *Arthur Andersen,* an insurance commissioner acting as liquidator sued the accounting firm of Arthur Andersen for negligence. *Id.* at 881. There, the court rejected the notion that the insurance commissioner was a mere receiver of the insolvent insurer, emplacing that the insurance commissioner acting as a regulator "is not acting to protect the investment of the insurance company's owners, but instead to protect the policy-buying public." *Id.* at 882.

The Ohio Supreme Court took an approach similar to *Arthur Andersen* in *Taylor v. Ernst & Young, L.L.P.,* 958 N.E.2d 1203 (Ohio 2011). The *Taylor* court rejected the narrow argument that the insurer's liquidator simply stood in the shoes of the insurer, noting that the liquidator sought to protect "the rights of insureds, policyholders, creditors, and the pubic generally." *Id.* at 1213 (*quoting Fabe v. Prompt Fin., Inc.,* 631 N.E.2d 614, 620 (Ohio 1994)).

As in *Andersen* and *Taylor*, the Iowa insurance commissioner does not simply stand in the shoes of the insurer, but has been charged by the legislature to protect broader public interests.

**D. Impact of Public Interest of Insurance Commissioner on Enforceability of Arbitration Clause.**

1. *Introduction.* The fighting issue in this case is whether a privately agreed upon arbitration clause between the founder and Milliman is binding on the insurance commissioner as liquidator. It is clear, of course, that the insurance commissioner is not a signatory to the arbitration agreement. A nonsignatory may be bound by an arbitration agreement, but only if traditional principles of state law allow the contract to be so enforced. *Arthur Andersen LLP v. Carlisle,* 556 U.S. 624, 631, 129 S. Ct. 1896, 1902 (2009). If the insurance commissioner was a mere

representative of the insurer, however, he might be seen as simply "stepping into the shoes" of the insurer.

2. *More than in shoes of insolvent insurer.* But as seen above, the insurance commissioner is not merely "stepping into the shoes" as a mere receiver. The insurance commissioner is also acting as a regulator. As was noted decades ago, the liquidator

> not only represents the insolvent insurance company, but he also represents its policyholders, the beneficiaries under the policies, the creditors, and is the representative of the public interest in the enforcement of the insurance laws as applicable to the policies of an insolvent insurance company.

*English Freight Co. v. Knox*, 180 S.W.2d 633, 640 (Tex. Civ. App. 1944).

More recently, in *Arthur Andersen* the court observed,

> Nor can AA's argument that the Insurance Commissioner acts only as an ordinary receiver exonerate AA from liability for negligent misrepresentations in an audit report. When carrying out his statutory regulatory duty of monitoring the claims-paying ability of an insurer, *the Insurance Commissioner is not acting to protect the investment of the insurance company's owners, but instead to protect the policy-buying public.* The Insurance Commissioner hence represents *far broader interests than those typically represented by an ordinary receiver*, whose potential claims are limited to those of the company in receivership.

*Arthur Andersen*, 79 Cal. Rptr. 2d at 882 (emphasis added).

A similar observation was made in an Ohio court, which found that

> [t]o permit the officers and directors of a regulated industry to attempt to defeat the liquidation statutes by privately contracting to resolve allegations of corporate mismanagement in a private forum of their own choosing is contrary to the purposes of the liquidation act and prejudicial to the rights of policyholders and creditors who have been harmed by the insolvency of the corporations.

*Covington v. Lucia*, 784 N.E.2d 186, 191–92 (Ohio Ct. App. 2003).

The Ohio Supreme Court came to the same conclusion in *Taylor*, 958 N.E.2d 1203. After determining that the liquidator of an insurance

company did not merely stand in the shoes of the insurer, the *Taylor* court declared that the case presented "a garden-variety attempt to enforce an arbitration clause against a nonsignatory." *Id.* at 1213. *Andersen, Covington,* and *Taylor* stand for the proposition that an arbitration provision agreed upon by an insurer is not binding on the insurance commissioner acting as liquidator under insurance liquidation statutes in light of his distinctive public responsibilities as the liquidator.

3. *No presumption of arbitrability.* Milliman suggests that under the FAA, there is a strong presumption that matters that relate to the underlying contract are subject to arbitration. That is true enough. *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650, 106 S. Ct. 1415, 1419 (1986). But this presumption does not arise until it has been shown that there is an underlying agreement to arbitrate. *Griswold v. Coventry First LLC*, 762 F.3d 264, 271 (3d Cir. 2014). In determining whether there is, in fact, an underlying agreement to arbitrate, the presumption is *against* arbitration. *Taylor*, 958 N.E.2d at 1213.

Further support for this proposition that an arbitration clause may not be enforced against a nonsignatory liquidator with public responsibilities may be found in *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 122 S. Ct. 754 (2002). In this disability discrimination case, the EEOC brought an action seeking victim-specific relief. *Id.* at 283–84, 122 S. Ct. at 758–59. The victim, however, had signed a contract agreeing to arbitrate employment claims. *Id.* at 282, 122 S. Ct. at 758. The question in *Waffle House* was whether the EEOC was subject to the arbitration provision signed by the victim. *Id.*

The Supreme Court held that the EEOC was not subject to the arbitration provision between the victim and the employer. *Id.* at 289, 122 S. Ct. at 762. The *Waffle House* Court emphasized that the EEOC was

empowered by statute to bring claims that sought victim-specific relief and that the EEOC was master of any such claim. *Id.* at 289–91, 122 S. Ct. at 762–63. In bringing such claims, the *Waffle House* Court noted that "the agency may be seeking to vindicate a public interest . . . even when it pursues entirely victim-specific relief." *Id.* at 296, 122 S. Ct. at 765. Where the public agency has authority to bring a claim and does so in the public interest, even when the relief sought is specific to a victim who signed an arbitration agreement, the public interest prevails and the arbitration agreement is not enforceable.

We adopted the *Waffle House* approach in *Rent-A-Center, Inc. v. Iowa Civil Rights Commission*, 843 N.W.2d 727, 732–33, 735–36 (Iowa 2014). In *Rent-A-Center*, we declared that "[t]he essential point of *Waffle House* is that the FAA's reach does not extend to a public agency that is neither a party to an arbitration agreement nor a stand-in for a party." *Id.* at 736.

**III. In Any Event, the Insurance Commissioner Validly Exercised His Unqualified Legislative Power to Disavow in Total the Insider Contract Between the Founders and Milliman.**

**A. Legislative Vesting in Insurance Commissioner of Unqualified Power to Disavow Contracts.** The Iowa version of the Insurers' Rehabilitation and Liquidation Model Act vests the insurance commissioner as liquidator with very broad powers. One of the broad powers vested in the commissioner is Iowa Code section 507C.21(l)(*k*) that provides that the insurance commissioner as liquidator may "affirm or disavow contracts to which the insured is a party." In this case, the insurance commissioner has disavowed the contract between the Founders and Milliman that, among other things, limited any liability Milliman might have to three times its fee for services.

The legislature's vesting in the insurance commissioner the power to disavow contracts is unqualified. Further, Iowa Code section 507C.1 provides that the act "shall be liberally construed to effect the purpose" which is "the protection of interests of the insureds, claimants, creditors, and the public." Combining these provisions means that if there is an insider contract that stands in the way of vindicating the interests of the insureds, claimants, creditors, and the public, the insurance commissioner may disavow the contract.

The insurance commissioner has reasonably concluded that the disavowal of the contract between the insurer and Milliman is in the public interest. The contract between the founders and Milliman was an inside deal that dramatically limited Milliman's liability for consequential damages. The insurance commissioner reasonably decided that disavowal of the contract, thereby eliminating application of any cap on damages, and pursuit of residual common law claims was in the best interest of the public.

**B. No Limitation to Executory Contracts.** Milliman suggests that the power to disavow contracts is limited to executory contracts. Other state courts construing a similar disavowal power have not limited them to executory contracts. For instance, in *Covington*, the insurance commissioner alleged that corporate insiders engaged in various torts, including breach of fiduciary duty, negligence, fraudulent transfers, and corporate mismanagement. 784 N.E.2d at 187. But the potential defendants had severance agreements which limited their liability. *Id.* The insurance commissioner disavowed the severance contracts, while the insiders argued that they were entitled to have the dispute resolved in arbitration as required by the severance agreement. *Id.*

The *Covington* court held that the insurance commissioner had the power to disavow the severance agreements. *Id.* at 192. The *Covington* court noted that, as here, the insurance commissioner was not seeking to enforce any rights under the contract, but was pressing contract claims. *Id.* Further, the *Covington* court observed,

> To permit [the officer] to have his action decided privately . . . when the liquidator has disavowed the contract is contrary to the interests of insureds, claimants, creditors, and the public generally as well as the interest of the liquidator who in the pursuit of his duties represents them.

*Id.* at 191. The *Covington* court further emphasized,

> To permit the officers and directors of a regulated industry to attempt to defeat the liquidation statutes by privately contracting to resolve allegations of corporate mismanagement in a private forum of their own choosing is contrary to the purposes of the liquidation act and prejudicial to the rights of policyholders and creditors who have been harmed by the insolvency of the corporations.

*Id.* at 191–92.

A few months after *Covington,* the same Ohio court decided *Benjamin v. Pipoly*, 800 N.E.2d 50 (Ohio Ct. App. 2003). The *Benjamin* court emphasized that the disavowal provision in Ohio law needed to be liberally interpreted to advance the purpose of the statute. *Id.* at 57. The *Benjamin* court noted that "[t]he liquidator must have freedom of action to do those acts most beneficial in achieving her objectives," and is not "automatically bound by . . . pre-appointment contractual obligations." *Id.* at 58–59.

The Nebraska Supreme Court considered the question in *State ex rel. Wagner v. Kay*, 722 N.W.2d 348 (Neb. Ct. App. 2006). Like *Covington* and *Benjamin, Wagner* held that the insurance commissioner as liquidator could disavow severance agreements of former officers and directors. *Id.* at 357–58.

Aside from the well-reasoned caselaw, it is clear that the Iowa legislature must have been aware of the difference between the term "contract" and "executory contract." On four occasions, the legislature has used the term "*executory* contract" when it wanted to qualify a legislatively granted power. *See, e.g.*, Iowa Code § 428A.2 (making an exception to property taxes for "[a]ny executory contract for the sale of land"); *id.* § 524.103 (defining "agreement for the payment of money" to include "accounts receivable and executory contracts"); *id.* § 554.13208 (determining rules for waiver "affecting an executory portion of a lease contract); *id.* § 554.13505 (allowing cancellation of lease obligations that "are still executory on both sides"). The legislature, however, did not use the term "executory" when it enacted Iowa Code section 507C.21(l)(*k*). Further, the legislature may be presumed to have been aware of the longstanding provision of the Federal Bankruptcy Code that expressly limits a trustee's power to "executory" contracts. 11 U.S.C. § 744. There is simply no such provision in Iowa law. Our charge is to apply the law as we find it.

Milliman cites *Maxwell v. Missouri Valley Ice & Cold Storage Co.*, 181 Iowa 108, 164 N.W. 329 (1917), and *State v. Associated Packing Co.*, 195 Iowa 1318, 192 N.W. 267 (1923), as supporting the position that the insurance commissioner's power to disavow contracts extends only to executory contracts. These older cases predate the Act, have nothing to do with insurance, and do not involve the insurance commissioner exercising unqualified powers of disavowal in the public interest pursuant to statutory authority. Rather, these are simply older cases involving ordinary receivers in less regulated businesses. As a result, nothing in these pre-Act, noninsurance cases suggest that the Iowa insurance commissioner's later, unqualified, legislatively established power to

disavow contracts should be limited to executory contracts. Indeed, the language of these cases prior to the enactment of the Act indicate that the legislature knew exactly what it was doing when it declined to limit the disavowal authority in Iowa Code section 507C.21(1)(*k*).

Milliman also cites anti-cherry-picking cases where courts have prohibited insurance liquidators from attempting to disavow certain provisions of contracts while enforcing other provisions. For example, in *Bennett v. Liberty National Fire Insurance Co.*, 968 F.2d 969 (9th Cir. 1992), the United States Court of Appeals for the Ninth Circuit held that because the liquidator was attempting to enforce contractual rights of the insurer, she was bound by the preinsolvency agreements. *Id.* at 972. Similarly, in *Costle v. Fremont Indemnity Co.,* 839 F. Supp. 265 (D. Vt. 1993), the district court refused to allow a liquidator to enforce an insolvent insurance company's rights under an agreement and at the same time escape the arbitration provision of that agreement. *Id.* at 272.

Here, however, the insurance commissioner is not cherry-picking the contract between Milliman and the founders. It has disavowed the entire agreement. All claims brought by the insurance commissioner in this proceeding sound in tort, not contract. As a result, cases like *Bennett* and *Costle* are not applicable under the facts presented here.

### C. **Power to Disavow Not Preempted by Federal Arbitration Act.**

1. *Generally applicable state law not preempted by FAA.*[5] Milliman further asserts that the power of the insurance commissioner to disavow contracts is preempted in light of the extraordinarily muscular

---

[5]The district court did not rule upon the question of whether the exercise of disavowal authority by the insurance commissioner under Iowa Code section 507C.21(1)(*k*) discriminates against arbitration clauses and is thus invalid under the FAA. The Milliman defendants did not file an Iowa Rule of Civil Procedure 1.904(2) motion. As a result, the issue has been waived. Nonetheless, in the alternative, I briefly address the merits of the issue here.

interpretation of the FAA in recent cases of the United States Supreme Court.[6]   But state law that is generally applicable and does not discriminate against arbitration provisions does not offend the FAA.  *See Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 686–87, 116 S. Ct. 1652, 1656 (1996).

The disavowal provisions of Iowa Code section 507C.21(1)(*k*) do not discriminate against arbitration provisions.   Iowa Code section 507C.21(1)(*k*) applies to all contracts, empowering the insurance commissioner to disavow contracts that it believes impair the public interest in a state liquidation proceeding.  There is simply nothing in Iowa Code section 507C.21(1)(*k*) that "single[s] out arbitration provisions for suspect status."  *Id.* at 687, 116 S. Ct. at 1656.  As a result, the general disavowal provision is within the scope of the savings clause of the FAA which does not preempt state law that prevents arbitration "upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.

2.  *Reverse preemption under McCarran-Ferguson Act.*  In any event, even if there is a conflict between the broad and liberally construed powers of the insurance commissioner to disavow contracts and the FAA in this case, preemption of federal, and not state law, results.  That is because of reverse preemption under the McCarran-Ferguson Act.  A brief review of background history will illuminate the nature of reverse preemption under McCarran-Ferguson.

---

[6]*See, e.g.*, Margaret L. Moses, *Statutory Misconstruction: How the Supreme Court Created a Federal Arbitration Act Never Enacted by Congress*, 34 Fla. St. U. L. Rev. 99, 127–31 (2006); Davis S. Schwartz, *Correcting Federalism Mistakes in Statutory Interpretation: The Supreme Court and the Federal Arbitration Act*, 67 Law & Contemp. Probs. 5, 23–26 (2004).

Historically, the regulation of insurance has been a matter of state concern. In *Paul v. Virginia*, 75 U.S. 168, 185 (1868), the United States Supreme Court held that Congress lacked the power under the Commerce Clause to regulate insurance, thus leaving the field to state regulators. In *United States v. South-Eastern Underwriters Association*, 322 U.S. 533, 64 S. Ct. 1162, 1164, 1178 (1944), the Supreme Court reversed its position and held that a contract of insurance between an insurer and a policyholder in different states constitutes interstate commerce and was thus subject to federal antitrust laws. *See* Willy E. Rice, *Federal Courts and the Regulation of the Insurance Industry*, 43 Cath. U. L. Rev. 399, 401 (1994).

After *South-Eastern Underwriters*, the Congress quickly endorsed the historical role of state regulators by enacting the McCarran-Ferguson Act. Under McCarran-Ferguson, "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating insurance . . . unless such [Federal] Act specifically relates to the business of insurance." 15 U.S.C. § 1012(b).

In *Humana Inc. v. Forsyth*, 525 U.S. 299, 307, 119 S. Ct. 710, 716 (1999), the United States Supreme Court established a three-part test to determine when reverse preemption of federal law occurs under McCarran-Ferguson. Reverse preemption occurs if (1) the state statute was enacted for the purpose of regulating the business of insurance; (2) the federal statute involved does not specifically relate to the business of insurance; and (3) the application of the federal statute would "invalidate, impair, or supersede" the state statute regulating insurance. *Id.*

In analyzing the first prong, Congress did not provide any guidance on the meaning of the phrase "regulating the business of insurance." In *United States Department of Treasury v. Fabe*, 508 U.S. 491, 508, 113 S.

Ct. 2202, 2211–12 (1993), however, the United States Supreme Court declared that the provisions of McCarran-Ferguson protecting state regulation of insurance were not to be narrowly construed.

The Iowa legislature certainly believes that the first prong of the *Forsyth* test has been satisfied. Through adoption of the applicability provisions in Iowa Code section 507C.1(4)(*f*)-(*g*), the legislature has declared that the provisions of Iowa Code chapter 507C were enacted "for the purpose of regulating the business of insurance," as quoted in 15 U.S.C. § 1012(b).

Such express declarations of the Iowa legislature do not bind this court. We have the power, in interpreting statutes, to tell the legislature that the unambiguous declaration that the liquidation statute is "for the purpose of regulating the business of insurance" is wrong and must be ignored in this case.

But the better reasoned judicial authority agrees with the legislature's declaration that the provisions of Iowa Code chapter 507C regulate the business of insurance. For instance, in *Fabe v. United States Department of Treasury*, 939 F.2d 341 (6th Cir. 1991), *aff'd in part, rev'd in part*, 508 U.S. 491, the Sixth Circuit held that Ohio's liquidation statute amounted to "a regulation of the 'business of insurance' within the meaning of the McCarran-Ferguson Act and thus subject solely to the provisions of state law absent explicitly conflicting legislation." *Id.* at 343.

Strikingly, the majority cites *Quackenbush v. Allstate Insurance Co.*, 121 F.3d 1372 (9th Cir. 1997), for the proposition that this case should be sent to arbitration. In actuality, *Quackenbush* unequivocally supports my position. *Quackenbush* declares that

> [u]nder *Fabe*, there is no question that California's insurer-insolvency provisions regulate the "business of insurance" and are saved from preemption by the McCarran–

> Ferguson Act. Thus, Allstate could not invoke the FAA to compel arbitration of its claims against Mission, which must be pursued through California's statutory insolvency scheme.

*Id.* at 1381.

Exactly on point!  As it turns out, however, the claim in *Quackenbush* was not brought under the state's statutory insurance insolvency scheme, but was brought outside the statutory context.  *Id.* at 1381.  As a result, the McCarran–Ferguson Act did not apply.  *Id.* at 1381–82.  Here, however, it is undisputed that the insurance commissioner's claim is brought under the Iowa statutory insurance insolvency scheme.

Other cases follow *Quackenbush.*  Following the Sixth and Ninth Circuits, the Tenth Circuit held in *Davister Corp. v. United Republic Life Insurance*, 152 F.3d 1277, 1281 (10th Cir. 1998), that the FAA was reverse preempted by a state liquidation regime designed to protect the interests of policyholders.  Similarly, in *Washburn v. Corcoran*, 643 F. Supp. 554, 557 (S.D.N.Y. 1986), the federal district court held that law related to liquidation of insurance companies was a state law regulating insurance and that the FAA had to yield to its provisions.

The second prong of the *Forsyth* test has been met in this case.  The FAA is not a statute specifically related to the business of insurance.

That leaves the third prong of the *Forsyth* test.[7]  Sending the case against the Milliman defendants to a private arbitration in New York plainly interferes with Iowa Code chapter 507C.  Iowa Code section 507C.1(4)(*g*) declares that one of the purposes of chapter 507C is to "enhance[] efficiency and economy of liquidation" and to provide "a comprehensive scheme" for the liquidation of insurance companies.  Iowa

---

[7]While the district court addressed the first prong of the *Forsyth* test, it did not address the second and third prongs.  Again, as the Milliman defendants did not file a motion to expand the findings of the district court, the issue has been waived.

Code § 507C.1(4)(*c*), (*g*). If Milliman succeeds divesting the Polk County district court of jurisdiction of the insurance commissioner's claims against Milliman, the interconnected causes of action in the litigation will be split into two forums. Claims against Milliman will be decided in New York, but claims involving the founders, including the claim that they aided and abetted and conspired with Milliman, will remain in Polk County district court. Such slicing and dicing of the litigation would neither be efficient nor comprehensive, as such piecemeal litigation and the possibility of inconsistent verdicts plainly impairs the ability of the insurance commissioner to fulfill the statutory purposes of Iowa Code chapter 507C. *See* Iowa Code § 507C.1(4)(*c*) (stating the purpose of the statute is to protect "the interests of insureds, claimants, creditors, and public" through "[e]nhanced efficiency and economy of liquidation"); *id.* § 507C.1(4)(*g*) (stating the purpose of the statute is promoted through a comprehensive scheme of liquidation); *see also Ernst & Young, LLP v. Clark*, 323 S.W.3d 682, 691 (Ky. 2010).

Further, sending the fundamental public policy issues involved in the litigation to a confidential arbitration proceeding in New York where New York law is to be applied obviously impairs the ability of the insurance commissioner to enforce Iowa law. The question of whether the insurance commissioner may disavow the consulting services agreement, thereby avoiding the draconian limitation of consequential damages and the exclusion of punitive damages, should not be decided by private arbitrators with limited rights of appeal. *See Benjamin*, 800 N.E.2d at 61; *Covington*, 784 N.E.2d at 191. Further, the broad power of the insurance commissioner to subpoena witnesses and compel production of documents under Iowa Code section 507C.21(1)(*e*) would now be subject to the discretion of a panel of arbitrators.

Finally, proceedings pursuant to liquidation of an insurance company are "of vital public interest and concern." Iowa Code § 507C.1(4)(*g*). To have the proceedings in this case conducted confidentially in New York is plainly inconsistent with the public's interest in the regulation of insurance and the purposes of Iowa Code chapter 507C.

The practical consequences of the approach of the majority is stunning. The dispute between the insurance commissioner and Milliman will be sent to a panel of arbitrators in New York. The disavowed contract calls for the dispute to be governed not by the laws of Iowa, but the laws of New York. It may not matter, however, as the private arbitrators will not be bound to apply the law. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 407, 87 S. Ct. 1801, 1808 (1967) (Black, J., dissenting) (noting arbitrators are not bound to apply the law). Further, the parties will not be entitled to wide discovery as ordinarily afforded by the Iowa rules of civil procedure, but will instead engage is such discovery as allowed by the grace of the private arbitrators in the exercise of unreviewable discretion. *See* Margaret M. Harding, *The Clash Between Federal and State Arbitration Law and the Appropriateness of Arbitration as a Dispute Resolution Process*, 77 Neb. L. Rev. 397, 489 (1998) (observing that discovery in arbitration is limited). The process will also be confidential, contrary to the public interest. *See Benjamin*, 800 N.E.2d at 61; *Covington*, 784 N.E.2d at 191. The ultimate decision of the private arbitrators, based on whatever law the arbitrator chooses and after whatever discovery is tolerated, will be subject to judicial review only on the narrowest of grounds. *See* 9 U.S.C. § 10.

In the arbitration, there will be a question of whether the damages limitation provision of the insider contract may be enforced in light of the

effort of the insurance commissioner to disavow the contract. That protean issue, heavy with public policy implications and dramatically affecting the remedy that might be available, will, apparently be decided by private arbitrators in New York, not the Iowa courts. The arbitrators may well decide that the provision of the agreement prohibiting punitive damages in most instances may well be enforceable. And factual issues related to the liquidators theory of liability and proven damages will be not be decided by an Iowa jury, but by three arbitrators not subject to voir dire and who do not receive instructions on the law.

All this is flatly contrary to the traditional historic commitment of the State of Iowa to regulating the insolvency of insurance companies and the statutory acquiesce of Congress in the broad exercise of that authority unfettered by federal meddling through bankruptcy proceedings or the FAA. It represents the privatization of public law at its starbursting zenith or, more accurately perhaps, at its unilluminated nadir. And it demonstrates how the FAA has been ripped from its very modest historical moorings[8] and recruited as a grotesque gargoyle-like accomplice in the privatization of public law.

Further, the access to justice issues are obvious. The insurance commissioner, a public official charged with representing the public interest, seeks to chase after potential wrongdoers who have allegedly, through their torts, caused untold damage on members of the Iowa public. The catastrophic failure of the health insurance entity left countless Iowans to scramble. The interests of Iowa healthcare providers who relied upon CoOportunity for timely payment were no doubt threatened. The

---

[8]For a detailed explanation of how the FAA has been transformed from a modest rule into a protean nemesis of public law, see my dissent in *Karon*. *See Karon v. Elliott Aviation*, 937 N.W.2d 334, 348 (Iowa 2020) (Appel, J., dissenting).

case demands a thorough airing and public accountability. Yet, according to the majority, the dispute will be handled confidentially in some office in New York applying New York law pursuant to the cramped remedies provided by the private insider contract.

Of course, at this stage, the pleadings of the insurance commissioner are only allegations. But the insurance commissioner, on behalf of the public, is lawfully entitled to attempt to make the case against the Milliman defendants in a public courtroom in Iowa where Iowa law applies; where Iowa courts make the necessary legal determinations; and where any factual disputes, including the amount of damages, if any, will be resolved by a fair and impartial Iowa jury.

The liquidation of this insolvent entity by the insurance commissioner is a regulatory action, not a private garage sale.

## IV. Conclusion.

The insurance commissioner acting as liquidator does not simply stand in the shoes of the insured in this case but is a state official representing the interests of policyholders, creditors, and the public. As a result, the insurance commissioner as a nonsignatory is not subject to an arbitration provision in an insider contract between the founders and Milliman. Further, the insurance commissioner has lawfully disavowed the contract pursuant to the Iowa legislature's unqualified grant of authority, Iowa Code section 507C.21(1)(*k*). Nothing in the FAA precludes the insurance commissioner from exercising his discretion to disavow an insider contract that contains an arbitration provision when he determines under a general disavowal statute that to do so is in the public interest. In any event, the McCarran-Ferguson Act prevents the application of federal law to state regulation of the business of insurance. As a result,

the ruling of the district court refusing to dismiss the insurance commissioner's action should be affirmed.